————o————

CHARLES HAMILTON, Respondent, vs. R. O. BOGGESS, Appellant.

1. *Limitation—Adverse possession—Color of title—Trespass.*—Possession, to avail under the statute of limitations, must be under color of title. A mere trespasser can never acquire title beyond his actual occupancy, by any length of possession.

2. *Land and land titles—Color of title, how given—Deed—Parol agreement— Description of land—Defect in title of grantor.*—Color of title may be by deed or some instrument of writing operating as an equitable transfer, or it may

| 63 | 233 |
| 96 | 434 |
| 97 | 359 |
| 97 | 488 |
| 97 | 603 |
| 63 | 233 |
| 34a | 389 |
| 34a | 416 |
| 35a | 403 |
| 35a | 525 |
| 63 | 233 |
| 38a | 290 |
| 38a | 657 |
| 63 | 233 |
| 39a | 297 |
| 63 | 233 |
| 43a | 229 |
| 63 | 233 |
| 104 | 407 |
| 63 | 233 |
| 46a | 546 |
| 63 | 233 |
| 108 | 348 |
| 48a | 310 |
| 63 | 233 |
| 51a | 523 |
| 63 | 233 |
| 120 | 66 |

Hamilton v. Boggess.

originate in a parol agreement, where actual and not constructive occupancy is claimed. Where color is given by deed, it must designate clearly the land conveyed, and no defect in the title of the grantor will affect its admissibility.

3. *Land and land titles—Sheriff's deed—Seal—Equity—Record—Description—Recitals—Notice—Adverse possession.*—A sheriff's deed without seal is a nullity, and improperly recorded, and does not amount to a transfer of title in equity; but such a deed may give color of title to one claiming by adverse possession. And where a subsequent deed from the grantee therein, having a seal and duly recorded, describes the land and recites the judgment and execution, and the sale and sheriff's deed, the record of the second deed is constructive notice of the sheriff's deed, and of the adverse possession.

4. *Limitations, statute of—Absence caused by military order.*—Absence from land, occasioned by the order of a military power which the party cannot resist, will interrupt the running of the statute of limitations.

5. *Adverse possession—A subordinate one may be converted into.*—That a possession not adverse to a title, but held in subordination to it, may be converted into an adverse possession, is well established.

6. *Adverse possession obtained through fiduciary relation—Change from friendly to adverse possession—Owner must be notified of.*—Where title is claimed under an adverse possession, originally obtained through a fiduciary relation existing between the tenant and owner of the land, the change in the possession from a friendly to an adverse one, must, in some way, be brought to the knowledge of the real owner.

7. *Practice, Supreme Court—Trial by court—Finding as to facts incontrovertible.*—On appeal from a case at law submitted to the court for trial, the facts on which the judgment is based must be taken to be as found.

*Appeal from Jackson County Circuit Court.*

*Gage & Ladd,* for Appellant.

I. The instrument from the sheriff to Wilson, being without seal, was inoperative at law; and it could convey no other than a legal title. Hence, its record imparted no notice. (Wagn Stat. 277, § 24; Keach vs. Kœnig, 55 Mo. 453; Moreau vs. Detchemendy, 18 Mo. 522; Allen vs. Moss, 27 Mo. 354; Moreau vs. Branham, 27 Mo. 351; Ware vs. Johnson, 55 Mo. 500.)

If the appellant cannot be charged with notice of the sheriff's deed, then the record of the deed from Wilson to Hamilton would affect no one with notice, such deed not being in the line of the title.

II. Admitting that the deed from Wilson to Hamilton did constitute color of title, his adverse possession under it was not such

as to give him the title.   Such possession must be adverse to the true owner, and not subservient to him ; and when one entering under the rightful owner wishes to change the character of his possession from a friendly to a hostile one, he must bring notice of such change directly to the owner.   And the adverse holding does not begin till then.   (Zeller's Lessee vs. Eckert, 4 How. 289 ; Willison vs. Watkins, 3 Pet. 43 ; Rigg vs. Cook, 4 Gilm. 351 ; Genin vs. Ingersoll, 2 W. Va. 558 ; Clarke vs. McClure, 10 Grat. 305 ; Kirk vs. Smith, 9 Wheat. 288 ; Tyl. Ej. 876 ; Ang. Lim. § 384.)

Respondent's possession did not become adverse from the time of recording the deed from Wilson. . That was at best constructive notice, and was insufficient. (Morey vs. Staley, 54 Mo. 422.)

Even if plaintiff's possession did become adverse in 1855, he has not shown ten years' continuous possession from that time. In September, 1863, he left, in pursuance of Gen. Ewing's order, and neither he nor any one else for him, ever resumed possession.   But admitting that some one went on for him in 1866, the continuity of his possession was broken by a lapse of two or three years ; and such continuity the law insists on as indispensable to a successful attempt, on the part of a squatter by simple possession, to nullify and destroy the title of the real owner.

There is no evidence of an abandonment of his property by Hugh Hamilton.   The evidence shows the contrary.   Plaintiff himself testified that he was, at the time of the execution sale, holding under and for his son, and by his son's consent.   The son had left it in charge of a tenant, and plaintiff says, that, up to the time of the sale, he attended to tax paying for his son.   The mere fact that Hugh had gone away, not expecting to return, amounts to nothing.   He could not very well take his land with him.

Admitting that plaintiff had held adverse possession of a part for ten years, that was only twelve or fourteen acres.   The remainder of lot 5 was never cultivated or inclosed, and no part whatever of lot 4.   He had held such possession as the law

requires, of the twelve acres, under color of title which would extend his constructive possession. And his possession would not, even by construction, cover any part of lot 4; that was a separate tract, wholly distinct from lot 5, a legal subdivision of itself.

III. Wilson's deed to plaintiff was a simple quit-claim of the interest derived by the sheriff's deed of March 1853, which was nothing. And when he afterwards obtained from Sheriff Briant a deed to the property, he was, or would have been, if appellant's title had not intervened, the owner of the property. The rights acquired by Wilson, by virtue of the deed of 1871, did not inure to the benefit of this respondent. (Butcher vs. Rogers, 60 Mo. 138.) And on the case, as the respondent made it himself, Wilson was the owner of the property, and respondent ought to have been turned out of court. He showed an outstanding title in Wilson.

IV. The appellant is a purchaser of this land for value, and has occupied it when there were no indications of the occupancy of any portion of it, with no knowledge or suspicion of any claim in Wilson or the respondent, and has made valuable improvements.

*A. Comingo,* for Respondent.

I. The sheriff's deed to Wilson, although without seal, and Wilson's deed to the plaintiff below, were properly admitted. They show color of title.

II. The deed from the sheriff to Wilson was recorded October 7th, 1853 ; that from Wilson to plaintiff the 13th of April, 1855, the former twenty, the latter eighteen years, before it was offered in evidence, and plaintiff had claimed and enjoyed the land from the date of the sale by the sheriff, the 6th of October, 1852. Hence, these instruments were properly admitted in evidence for the purpose of showing color of title and also notice to defendant. (Musick vs. Barney, 49 Mo. 458 ; Maupin vs. Emmons, 47 Mo. 304 ; Wagn. Stat. p. 596, § 40, construed in connection with p. 595, § 35.)

III. The court did not err in its declaration of law. The facts as found, and as plainly shown by the record, disclose an unquestionable color of title, and open, notorious and uninterrupted possession, for more than ten years, of a part of the premises, claiming the whole adversely to all other claimants. (Tyl. Eject. 860–863 ; United States vs. Arredondo, 6 Pet. 743 ; Clark vs. Courtney, 5 Pet. 354 ; LaFombois vs. Jackson, 8 Cow. 589 ; Gittens vs. Lowry, 15 Ga. 336 ; McCall vs. Neely, 3 Watts. 72 ; Jackson vs. Whitbeck, 6 Cow. 632 ; Ang. Lim. (4 Ed.) §§ 404, 405 ; Rannells vs. Rannells, 52 Mo. 108 ; Washb. Real Pr. pp. 499, 500 ; Jackson vs. Rightmyer, 16 John. 314 ; Smith vs. Lorillard, 10 Id. 338.)

The fourth and fifth instructions, refused the defendant, declare in effect that the deeds from the sheriff to Wilson and from the latter to plaintiff, are void, and give no color of title. They were properly refused. (See Rannells vs. Rannells, and authorities, *supra*.)

The sixth instruction, refused defendant, declares that plaintiff cannot recover any part of lot 4, even conceding that he held a portion of lot 5, as claimed—a proposition that cannot be successfully maintained. (Ang. Lim. [4th Ed.] §§ 400, 401, and authorities cited ; 2 Washb. Real Pr. [2nd Ed.] p.508, § 36 ; Heiser vs. Richel, 7 Watts. 35.)

The ninth instruction was properly refused. It declares that plaintiff is not in any event entitled to recover more than he actually occupied adversely.

The eleventh instruction, which declares that if plaintiff's possession was in the beginning with the consent of and under Hugh Hamilton, the plaintiff must show actual notice of his adverse claim " brought home " to the latter, and ten years adverse possession thereafter, is not warranted by the facts. Hugh Hamilton had abandoned his land to his creditors and abandoned his residence in the State. He felt no concern about his property, as he never paid any attention to it after he left the State, and the acts of plaintiff appear to have been voluntary or not performed at the request of the son.

Hugh's abandonment, the occupation of the land by plaintiff after it was sold by the sheriff to Wilson, claiming it as his own against all the world, the payment of the taxes, payment of the purchase money to Wilson, and the recording of the deed from Wilson, are acts that unmistakably indicate plaintiff's adverse claim. (Draper vs. Shoot, 25 Mo. 197; Warfield vs. Lindell, 30 Mo. 272, and 38 Id. 561.)

The twelfth instruction declares in effect that if plaintiff quit the possession of the premises, in obedience to order No. 11, he cannot recover unless there were ten years of adverse possession, open, notorious, etc., exclusive of the time they were vacated by him in consequence of said order. As this military order was imperative, there was a compulsory break of about two and a half years in his possession. The instruction was therefore properly refused. (Fugate vs. Pierce, 49 Mo. 441; McLaren vs. Murphy, 19 Up. Can. 609; Jackson vs. Rightmyer, 16 John. 314; Smith vs. Lorillard 10 Id. 338; Den vs. Morris, 2 Halst. [N. J.] 6.)

NAPTON, Judge, delivered the opinion of the court.

This is an action of ejectment for lots 4 and 5 of the northwest quarter of section three, township 44, range 33, in Cass County, begun 16th September, 1869.

The oral testimony in this case, as reported in the bill of exceptions, does not explain as clearly as it might have done some material facts touching the locality of the land in dispute and its partial occupancy subsequent to its abandonment in 1863.

As far, however, as I have been able to gather the facts from rather confused and occasionally contradictory statements of witnesses, they appear to be about as follows:

Charles Hamilton, the plaintiff, resided on a farm in Cass County, and adjoining it on the south-west, his son Hugh owned two lots in the northwest quarter of section 3 (being the land in controversy) called Nos. four and five, containing together about one hundred and fifty-nine acres. It does not appear that the son ever had any part of these lots inclosed. He left this State for California in 1849 and has never returned.

At the time Hugh Hamilton left for California, he was largely in debt, and according to the testimony of his father had no intention of returning, but abandoned his property here, which apparently consisted of several other tracts of land besides the one now in dispute, to his creditors. The fact that he left and never returned is undisputed. That he abandoned his property here to his creditors and never intended to return, is an inference which the court below drew from the evidence.

In 1849, Wilson and Parker obtained a judgment against Hugh Hamilton, upon which an execution issued which was levied on the lots four and five, and in 1852, on a sale under this execution, Wilson, one of the judgment creditors, became the purchaser, having previously seen the plaintiff and made an arrangement with him to let him have the land on payment of $450, which sum was sent by plaintiff to Wilson on the day of the sale.

The plaintiff at this date had in cultivation twelve or fourteen acres, inclosed in the northeast corner of lot five, which inclosure seems to have been made originally under a mistake in regard to the lines of his farm, it having been made before the farm of plaintiff was surveyed. But whether it was by mistake or through permission of his son, this occupancy was at all events conceded to have been in subordination to his son's title.

In 1853 an instrument in writing which purported to be a deed, was made by the sheriff of Cass county (Standford) to Wilson, the purchaser above referred to, for lots four and five. The original paper was lost, but the record of it given in evidence, upon proof of the loss, showed an instrument without seal or scroll, though purporting to be under the hand and seal of the sheriff, and acknowledged by him in open court and recorded.

In June, 1854, Wilson made a deed to the plaintiff in accordance with the arrangement spoken of by plaintiff as having been made before the sale under execution. This deed, in consideration of $450 acknowledged to have been paid, conveyed all the right, title and interest in lots four and five derived from the deed executed to him by Standford, the sheriff, on March 23, 1853. This deed of Wilson's was recorded on the 13th April, 1855.

After 1852, when the arrangement with Wilson was made and the sale under execution occurred, the plaintiff by consent of Wilson was allowed to retain possession of the twelve or fourteen acres he had previously inclosed. He, from that time, as he states on the trial, claimed the lots four and five as his own.

It was admitted on the trial, as the record states, " that he was in possession of the land in controversy under his son Hugh at the time of the sale under the execution, and that there was no change of possession at the time of the sale or deed from Wilson to plaintiff, nor any surrender and retaking of possession of the two lots in controversy under the Wilson deed."

In the fall of 1863 the plaintiff left his farm, and to show the circumstances under which he left, and the date of his leaving, a copy of order No. 11 issued from the headquarters of the military district termed " the district of the border," on August 25, 1863, was offered and read in evidence. It is only necessary to state here that this order required all persons living in Jackson, Cass and Bates counties, and that portion of Vernon included in that military district, except those living within one mile of the limits of Independence, Hickman's Mills, Pleasant Hill and Harrisonville, and except those in certain parts of Kaw township named, to remove from their places of residence within fifteen days from the date of the order. Officers were required to remove to military posts all the grain, hay, &c., found in the fields or elsewhere to military posts or to destroy it. This order was signed by the Brigadier General by his adjutant.

The plaintiff not coming within the exceptions was compelled to leave his farm, and he did so before the expiration of the fifteen days named as a limit in the order, and he went to Callaway county, and thence to St. Louis and New York, and thence to California.

In 1865 it appears that the fence inclosing this twelve acres in lot five was not standing. In 1866 a nephew or relative of plaintiff, probably by authority from the plaintiff, lived on the plaintiff's farm and made use of the grass (timothy), which at that date appears to have been the only crop on this twelve or four-

teen acres. The taxes on the land in 1867, 1868 and 1869 were paid by plaintiff (the receipts for these years were produced on the trial), but the plaintiff stated that he paid the taxes from the time his son left for California, at first for his son and after 1852 for himself, but that the receipts previous to the war had been lost.

Meanwhile, in 1860, a judgment was rendered in the circuit court of Cass county against Hugh Hamilton for about $573, and in 1867 an execution issued on it, under which the land in dispute was sold to the defendant, and a deed was made to the defendant by the sheriff. This deed was duly executed, was dated in 1867, and recorded in that year.

The defendant, through his tenant, Headley, took possession of the land in 1868, built a house on it and inclosed forty or fifty acres. It appears that the old fence which embraced the fourteen acres in cultivation being down, Berry, who was in possession of the plaintiff's farm, and Headley rebuilt this fence in conjunction so as to follow the surveyed lines, thereby leaving Headley in possession of the disputed twelve or fourteen acres.

The plaintiff at this time had not returned from California, but returned in 1869. The testimony is contradictory as to the date of his return, for he states at one time that he returned four years before the trial, which would be in 1868, and at another that he returned five years before; but as the plaintiff immediately claimed the fourteen acres which his agent had allowed Headley to inclose, I infer that he did not return till 1869, when this ejectment was instituted.

Upon the trial objections were made to all the deeds offered to plaintiff, and exceptions taken to their admission by the court.

The defendant testified that he bought the land in dispute for the consideration named in the deed ($500) from the sheriff and in good faith, not knowing that any other person than Hugh Hamilton had any claim to said land.

A jury having been dispensed with, the court declared the law to be as follows :

16—VOL. LXIII.

" If it appears from the evidence that plaintiff was in the acttual possession of a portion of the land described in said petition, having such portion actually enclosed and in cultivation on October 6th, 1852, holding for his son (Hugh Hamilton) the owner thereof ; that prior to that time Wilson & Pendelton had recovered a judgment against said Hugh Hamilton in the circuit court of Cass county ; that on the 6th day of October, 1852, under an execution on said judgment the sheriff of Cass county sold all the right and title of said Hugh Hamilton in and to said land ; that John Wilson, one of said firm, became the purchaser thereof, and paid the purchase money therefor ; that at the time of said sale, said Hugh Hamilton was in embarrassed circumstances and had left the State of Missouri intending to abandon his property to the claims of his creditors ; that on the day of or prior to said sale it was agreed between the said Wilson and said plaintiff, that said plaintiff was to have said land if purchased by said Wilson by paying him therefor ; that about the time of said sale by said sheriff, and in pursuance of said agreement, plaintiff paid said Wilson the sum of $453 for said land, and thereafter remained in the open, uninterrupted, actual possession of a portion of said land, having the same enclosed and in cultivation, claiming title to the whole in good faith ; that the sheriff of Cass county, on the 7th day of October, 1853, in pursuance of said sale under said execution, attempted to execute to said Wilson a sheriff's deed for said land, and only failed to do so by neglecting to affix a seal or scroll, as a seal to said writing ; that said Wilson, in pursuance of said agreement with plaintiff, permitted him to remain in the possession of said land under claim of title ; that said Wilson afterwards, on the 12th day of June, 1854, executed to plaintiff the deed read in evidence, in pursuance of said agreement, and that said deed was recorded in the recorder's office for Cass county on the 13th day of April, 1855, and if the plaintiff from the date of the recording of said deed remained in the open, continuous, notorious, uninterrupted, adverse and actual possession of said portion of said land, having the same enclosed and in cultivation, claiming title to the whole of the land described in said last men-

tioned deed in good faith, and so continued in such possession of said part, having the same enclosed and in cultivation, claiming title to the whole in good faith, until some time in the month of September, 1863, that he then left the actual possession of such involuntarily, without any intention to abandon his possession or claim, but by compulsion by reason of the requirements of said military order No. 11 read in evidence, and that plaintiff, by his agent, so soon as by the terms of said order or otherwise he was permitted so to do, resumed the actual possession of said portion of said land so held by plaintiff in possession prior to his removal therefrom, still claiming title to the whole in good faith, and that he paid the taxes on the whole of said land from the time he purchased of said Wilson up to the time of the commencement of this suit, then the plaintiff is entitled to recover the whole of the land in said petition described, notwithstanding his actual, visible possession of said part of said land may not have continued for ten years from the time of the recording said deed from said Wilson to the plaintiff, provided ten years had elapsed from the time of the recording said deed last mentioned, at the time said plaintiff so resumed such possession by his agent."

Some instructions were given on behalf of defendant at his instance and several refused, but all the points discussed in the case are clearly presented by the instruction of the court, and it is deemed unnecessary to copy them.

The verdict and judgment were for the plaintiff.

Where titles depend on adverse possession alone, embarrassing questions are frequently presented, not so much on account of any great contrariety of authority in regard to the law governing such cases, as because of the great diversity of shapes which the facts of different cases present. It seldom happens that the facts of any two cases are alike. To a jury usually belongs the determination of the facts, and the province of the court is to declare the law applicable to them. When both the facts and the law are left to the court, as was done in this case, we must assume the facts to be as found by the court, and confine our examination to the propriety of the declarations of law based upon the facts assumed.

One of the principal objections urged to the instruction or declaration of law given by the court in this case, is based on the nullity of the sheriff's deed. It is urged that the absence of a seal rendered it void—that being void it furnished no color of title, and that the subsequent deed from the purchaser at the sheriff's sale, being based on this deed and reciting it, could convey no title and therefore could furnish no color of title to support an adverse possession.

There is no doubt that possession, to avail the possessor under the statute of limitations, must be adverse or hostile to the real owner, and must be *bona fide*, taken under what the law terms color of title. A mere trespasser can never acquire title by any length of possession beyond his actual occupancy. What is a color of title has not been very well defined. It may be by deed or some instrument of writing operating as an equitable transfer, or it may originate in a parol agreement in a case where actual and not constructive occupancy is claimed. When it originates by a deed or an instrument purporting to be a deed, there has been a difference of opinion in regard to the requisites which a deed must need which will be allowed to be a color of title. Some highly respectable authorities insist that the deed must be at least clothed with the requisite formalities—that it must be under seal. All agree that it must designate clearly the land conveyed, and all agree that any defect in the title of the grantor will not affect its admissibility as a color of title.

The opinion that a deed, defective on its face by reason of its having no seal, or because it discloses or recites facts which show its invalidity as a conveyance, is not such a deed as supplies a color of title to one who claims merely by adverse possession, is maintained by the courts in Louisiana and Kentucky, and occasionally seems to be the doctrine of some other States.

In Frique vs. Hopkins (4 Martin, 224), Judge Martin says: " The correct doctrine we think is this : that if the title under which the acquisition is made, be null in itself from defect of form or discloses facts which show the person from whom it is acquired has no title, it cannot form the basis of this prescription, because

the party acquiring must be presumed to know the law, and consequently wants the *animo dominii*, which is indispensable in cases of this kind. But when the title is free from these defects and the property is not transferred by want of title in the party making the transfer, then it forms a good ground for the prescription ; or, in other words, the inquiry is whether the error be one of fact or of law."

This opinion of the eminent jurist in Louisiana was followed in Kentucky, in Hoskins vs. Helm (4 Littell, 310). They were both based on a maxim which everybody knows to be false in fact, though doubtless tending in its practical application to useful and just ends. The question is as to the *quo animo*, and in arriving at this it would require a large amount of credulity to suppose that a grantee in a deed, in taking possession under it, perfectly understood the law which regulated its constituent parts.

In Jackson vs. Newton (18 Johns. R., 361), Judge Spencer observes : "With respect to the want of seal to the deed when it was executed, although that fact has been submitted to a jury, who have found in conformity to the opinion of the presiding judge, that there was no seal originally to the deed, I must say that I should hardly have been of that opinion ; but in the point of view we are now considering the case (that was in regard to adverse possession under the limitation statute), it is immaterial whether the instrument was sealed or not. Had there been a seal the title of Newton would have been perfect without a possession, and in that light only is it material. In Jackson vs. Wheat we decided, upon the authority of several prior cases there referred to, that to constitute an adverse possession it was only necessary it should have been under claim and color of title."

In Dickinson vs. Breedon (30 Ill. 326), it is said by the court that " any deed purporting on its face to convey title, no matter on what it may be founded, is color of title," and the court repeat the decision made in Parker vs. Walls (27 Ills. 224), where it was determined that " a party claiming color of title might avail, in derainging his title, of a deed wanting a seal."

In Burkhalter vs. Edwards (16 Ga. 593), it was held that a sheriff's deed, though void because of no execution to support it, was still color of title, and in Walls vs. Smith (19 Ga. 8), a *fi. fa.* against the plaintiff's grantor was given in evidence and allowed as color of title, and the court declared that " color of title was anything in writing connected with the title which served to define the extent of the claim."

In Bogardus vs. Trinity Church (4 Sand. Ch. 738), it was observed by the chancellor: " To found the defense of adverse possession under a claim of title, it is wholly immaterial whether the claim be made under a deed valid in form or under one wanting in all the essentials of a proper conveyance. Indeed, an actual occupancy by one claiming title, will ripen into a perfect right in twenty years, although he has no written evidence of title whatever. Nor does the circumstance that the title claimed is void, or that it was taken or commenced in fraud of the law, detract from the force of an adverse possession under it, although it was said in Livingston vs. Penn. Iron Co. (9 Wend. 511), that an adverse possession founded by the grantee upon a deed obtained by fraud, or by a deed executed for the grantor by a person acting without authority to the knowledge of the grantee, will not be extended beyond the limits of the lands actually occupied."

And this decision in Bogardus vs. Trinity Church was sustained by the Supreme Court of the United States in Harpending vs. The Reformed Protestant Dutch Church (16 Pet. 455), and by the Court of Errors of New York in Humbert vs. Trinity Church (24 Wend. 587), and by the case of Wright vs. Mattison (18 How. 57), where the whole subject is reviewed.

Mr. Tyler, in his Treatise on Ejectment, concludes that the weight of authority sustains Judge Martin's opinion, but in Angel's work on Limitations, the contrary inference is drawn from the authorities, in which we coincide.

This point has been referred to here somewhat at length, because it has been urged that the plaintiff's possession was based upon the sheriff's deed of 1853, although the court, by its instruc-

tion or declaration of law, limited the origin of the adverse possession to the date of the record of the deed from Wilson to plaintiff. And it is only material to the determination of this branch of the case to pass on the latter, which, it is conceded, was executed with all the requisite formalities, although it conveyed no title except what was conveyed to the grantor by the sheriff's deed, and as that was a nullity Wilson's deed conveyed nothing. Although Wilson's deed conveyed no title, because the deed to him was inoperative, yet if there was a continuous adverse possession under Wilson's deed for a period long enough to form a bar, the declaration of the court was right. This brings us to the examinations of two other questions involved in the case—first, whether the possession proved in this case was continuous and without interruption; and secondly, whether it was adverse.

The plaintiff, after the issuance of order No. 11, the substance of which has been stated, left his farm and the premises in controversy in 1863, and his agent never took possession till 1866. The question is, whether this absence effected a discontinuance of his possession. In La Fombois vs. Jackson (8 Cow. 589), the chancellor, speaking for the whole Court of Errors in New York, observed on this point: "The evidence shows continued possession of the lot by defendant and his executors for upwards of thirty-five years, under a claim of title against all the world." The fact was that in 1776 his possession was interrupted by the possession of the British army of New York, when La Fombois left his place and never returned till the close of the revolutionary war. But the judge says: "He is found in possession in 1776, and must have taken possession a considerable time before, for he had made improvements on the lot and erected a dwelling house upon it, which he occupied. He was expelled by the public enemy, and continued in involuntary exile from it during the war, but on the restoration of peace he returned to it as his domicile, rebuilt his house, etc." It was in this case agreed by all the judges that this absence, occasioned by the war, did not break the continuity of his possession. So in this case, although the war of 1861 might be thought to differ essentially from that occasioned

by the revolt of the colonies of Great Britain, the absence from one's domicile occasioned by military force, is essentially the same.   It was an enforced and involuntary absence.   It was occasioned by the order of a military power which the plaintiff could not resist.   His obedience to this order could no more be regarded as an abandonment of his home than his temporary absence from it in case of a destruction of his residence and farm by fire or other casualty.   His return or the return of his agent so soon as it was safe, is found by the court as a fact established by the evidence.

The next question, and indeed the main question in this case, and the only one presenting any difficulty, is, whether this possession of the plaintiff was adverse or hostile to his son's title, and if hostile, when and how it became so?

It will have been observed from the statement heretofore made that the possession of the twelve acres (we will call it 12 for convenience, though it is spoken of as 12 or 14), in lot 5, began long before 1852, though whether before Hugh left for California, or after, does not appear.   It seems to have originated in mistake—it was inclosed with plaintiff's farm before any survey had been made of the farm or of the lots 4 and 5, and the south line of plaintiff's farm was run across the northeast corner of lot 5, because the exact boundaries of either were unknown.  When this mistake was discovered does not appear, but in 1852 the plaintiff bought, or thought he had bought, the two lots 4 and 5 at a sheriff's sale, and thenceforward claimed both these lots and paid taxes on them up to the year 1869.   No change in the extent or character of his possession of these 12 acres ever occurred; they remained under fence till 1868, or rather till the fence was destroyed after 1863 in some way, and when this happened does not appear from the evidence.   It does appear, however, that a nephew or grand-son of plaintiff, in taking possession in 1866 of the plaintiff's farm, made use of the grass growing on this 12 acres, and afterwards, in 1868, allowed the defendant's lessee to take possession of it and inclose it along with other portions of lot No. 5.

That a possession not adverse to a title but held in subordination to it may be converted into an adverse possession, is well established. What acts will have that effect where the relation of landlord and tenant, trustee and *cestui que trust*, vendor and vendee, or tenants in common, exists between the occupant and the owner of the title, is not so well settled. "The facts which have usually gone to make out a case of adverse possession," it is observed in Warfield vs. Lindell (30 Mo. 286), "have been such as a refusal of the co-tenant to permit his participation in the profits, or his entry, a denial of his title, claiming under a defective deed for the entirety, purchasing the co-tenant's title at a sheriff's sale and an exclusive claim under it, or the conveyance of the whole by deed and an entry by the grantee under the deed (2 Cruise Dig., title W., sec. 14, note 3), and we may add, following the case of Law vs. Patterson (1 W. & S., 186), putting up improvements without consultation with the co-tenant and under his observation, and taking the entire profits without objection from him."

In Zeller's lessee vs. Eckart (4 How. 296), Mr. Justice Nelson observes on this subject; "The only distinction between this class of cases and those in which no privity between the parties existed when the possession commenced, is in the degree of proof required to establish the adverse character of the possession. As that was originally taken and held in subserviency to the title of the real owner, a clear, positive and continued disclaimer and disavowal of the title and assertion of an adverse right, and to be brought home to the party, are indispensable, before any foundation can be laid for the operation of the statute. Otherwise the grossest injustice might be practiced; for without such notice he might well rely on the fiduciary relation under which the possession was originally taken and held, and upon the subordinate character of the possession, as the legal result of those relations."

It seems clear, from this and other authorities equally explicit, that where title is claimed under an adverse possession originally obtained through a fiduciary relation existing between the tenant and owner of the land, the change in the possession from a

friendly to an adverse one, must in some way be brought to the knowledge of the real owner. And the books abound with nice distinctions in regard to the kind of notice which is really necessary to make the possession adverse.

But the question in this case is, whether any fiduciary relation ever existed between the plaintiff and his son in regard to the land. It is assumed, that because he paid taxes on the land for Hugh, and had inclosed a portion of it, he was a tenant of Hugh, and at all events an agent. It must be confessed that the testimony on several points of this case is not so clear as it might have been, but the court finds that "Hugh left the State of Missouri in 1849, intending to abandon his property to the claims of his creditors, and with no intention of ever returning." The occupation of the twelve acres by the plaintiff was simply a mistake—it was not taken under any tenancy, nor was any rent paid. The relation of landlord and tenant between the son and the father never existed, nor was there any agency, except so far as the payment of taxes was concerned, and this the father did, so far as we can see, without any suggestion from his son, much less any formal investment of agency or authority to act for him. The son left this land to a scramble among his creditors—so it is found. Why, then, apprise him of the results of executions against the land? What did it concern him who bought at the sale? Although the father and son corresponded, the former, in his testimony, concedes that he never mentioned the subject to his son in California. It would be strange if he had not, if we assume that the father was originally a tenant or agent, or had any sort of trust reposed in him. But it is obvious that he never so regarded himself—that there were no confidential or trust relations existing between them. By mistake the father had inclosed a portion of the son's land, not as a tenant nor as an agent, nor in any other fiduciary capacity. When this mistake was discovered does not anywhere appear, but the father disclaimed any adverse possession by reason of it. But when the father bought at sheriff's sale, in 1852, through Wilson, he did claim the entire tract, not on account of his possession of the

twelve acres, but because he supposed himself to have acquired a good title. The deed from Wilson to the plaintiff was duly recorded in April 1855, and this is the date fixed on by the court as the beginning of the adverse possession under claim of title. This deed undoubtedly gave constructive notice to every one of its contents, and as it referred to the deed of 1853, from the sheriff to Wilson, which was on record, though improperly, it might be considered as imparting notice of such invalid conveyance. It was clearly no proof of actual notice to Hugh Hamilton in California, or of any fact which would authorize the inference of actual notice. But as Hugh Hamilton had abandoned these lands in Cass county to his creditors, no actual notice was due to him. The purchase made by his father was not effected by any trust or confidence reposed in him. It was a matter of indifference to Hugh Hamilton who became purchaser under executions against him.

But the record of this deed from Wilson to Chas. Hamilton, the plaintiff, did constructively notify the present defendant, who bought in 1867, under an execution issued on a judgment rendered in 1860, subsequent to the one under which plaintiff bought. This deed from Wilson to Chas. Hamilton described the land, and recited the judgment and execution against Hugh Hamilton, and the sale to Wilson and the deed to Wilson from the sheriff. And though we must, under repeated adjudications of this court, hold the sheriff's deed a nullity, and improperly recorded, and not amounting to a transfer of title in equity, still the fact that such deed was executed is recited in the recorded deed. Was not this sufficient to put a purchaser under a subsequent execution on inquiry? The defendant was notified, constructively, that the title of Hugh Hamilton had been passed to some one else, or had at least been attempted to be conveyed; and if possession under that supposed title had been of sufficient duration to make out a title under the statute of limitations, nothing would pass under the second execution and sale.

When a case is submitted to a court and a jury dispensed with, the facts upon which the court bases its judgment are incontro-

vertible here. This court has only the power to review the law declared by the court below, and when that court is intrusted with both the facts and the law, we must assume the facts to be as that court finds them. This observation is not made because in the present case the facts in evidence did not justify the assumption of the circuit court in regard to them, for there is, in our opinion, nothing unreasonable in the deductions made by the circuit court from the evidence presented, but because we wish it to be understood that it is not our province to determine facts, or review the finding of juries or courts on them, except in chancery cases.

The judgment must be affirmed. Judge Hough, having been of counsel, did not sit in this case; Judge Wagner absent; the other judges concur.