CATHCART v. MATTHEWS *ET AL.*

(89 S. E. 1021.)

1. LANDLORD AND TENNANT—USE AND OCCUPATION—ACTION FOR RENT—CONTRACT.—An action for rent or for the use and occupation of land rests upon contract, express or implied.

2. PROPERTY—RIGHT OF POSSESSION.—The true owner of realty who also has the right to possession may take possession whenever he can do so, without committing a breach of the peace.

3. TRESPASS — USE AND OCCUPATION — ACTION FOR RENT — TORTIOUS HOLDER.—An action for rents and profits, or for use and occupation, cannot be maintained against one whose entry was tortious and remained so.

4. PROPERTY—POSSESSION—INCIDENTS.—The right to the possession of land, whether legal or equitable, coupled with possession in fact, ordinarily carries with it the right to rent it and collect the rents.

5. TRESSPASS—RIGHT OF ACTION—TITLE.—An equitable right to possession, coupled with possession, is sufficient to sustain a legal action for trespass thereupon.

6. TRESPASS—TRESPASS QUARE CLAUSUM FREGIT—COMPLAINT.—Allegations of title and possession in plaintiff's intestate and a wrongful entry thereupon by another were sufficient to make out an action of trespass *quare clausum fregit.*

7. TRESPASS—PRESUMPTION—DAMAGES.—Although no damage is alleged in the complaint in an action of trespass *quare clausum fregit,* the law will presume damage from the trespass.

8. TRESPASS—TRESPASS QUARE CLAUSUM FREGIT—POSSESSION.—To maintain an action of trespass *quare clausum fregit,* the plaintiff must prove that he was in possession, actual or constructive, when the trespass was committed.

9. TRUSTS—ADVERSE POSSESSION—RIGHT OF ACTION.—The possession of the *cestui* who had executed a trust instrument whereby the trustee was to hold the property subject to such uses as he might direct could not be adverse as against the trustee, since adverse possession presupposes such a trespass as will give rise to a cause of action, and the use of the property by the *cestui* would not have given the trustee a cause of action.

10. TRUSTS—ADVERSE POSSESSION—HOSTILE CHARACTER—ESTOPPEL.—Where *cestui* directed the trustee to make a conveyance, his possession thereafter was, as a matter of law, under and in subordination to the title conveyed, and not adverse to it, as he would be estopped by his act to claim against the grantee, unless there was afterwards a distinct disavowal of the act, and an unequivocal assertion of right in himself, and notice thereof to the grantee.

11. TRUSTS—"CONSTRUCTIVE TRUSTEE"—PURCHASER.—One purchasing from a trustee with notice of the trust takes subject to it and becomes a "constructive trustee."

12. ADVERSE POSSESSION—REQUISITES—CONTINUITY.—To confer title by adverse possession there must be such continuity of possession as will furnish a cause of action for every day during the whole period required to perfect title by adverse possession.

13. INSANE PERSONS—TORTS—LIABILITY.—A lunatic is liable in a civil action for actual damages for such of his torts as do not involve intent as a necessary ingredient, so that for every day a lunatic had wrongful possession the holder of the legal title had a cause of action against him.

14. ADVERSE POSSESSION—CONTINUITY—ACTUAL POSSESSION OR OCCUPATION.—The rule requiring continuity of possession does not mean that the person in possession, his tenant or agent must be actually on the land during the whole of the statutory period; actual possession once taken will continue, though the party taking such possession should not continue in actual occupancy until he is disseised, or until he does some act amounting to a voluntary abandonment of the possession.

15. ADVERSE POSSESSION—QUESTION FOR JURY—INTERRUPTION OF POSSESSION.—Possession is a matter of fact; so that whether one's possession was interrupted was properly left to the jury.

16. ADVERSE POSSESSION—ABANDONMENT—INTENT.—Abandonment of possession involves intention.

17. ADVERSE POSSESSION—QUESTION FOR JURY—ABANDONMENT—INTENT.—When the evidence is susceptible of more than one inference, the question of intent involved in abandonment is one of fact for the jury.

18. INSANE PERSONS—QUESTION FOR JURY—CAPACITY—INTENT.—Whether one subject to periods of insanity was capable of forming an intent to abandon possession, whether he was capable of forming and did form the intent to hold the possession adversely and whether he was

capable of directing, and in fact directed, his trustee's conveyances, were questions for the jury.

19. INSANE PERSONS—DEGREE—TRANSACTION.—A man may be insane on one subject, but capable of transacting business on all others; the question in any case being not merely whether he was insane at the time of the questioned transaction, but whether he was so insane as to be incapable of doing the particular act with reason and understanding.

20. JUDGMENT—CONCLUSIVENESS—PARTIES.—Judgments to which one was not formally a party were not conclusive on him or his privies, but a judgment to which one was a party was conclusive as against him and his privies.

21. INSANE PERSONS—ADJUDICATION—EVIDENCE.—An adjudication that a person was sane at a certain time would not preclude proof that he became insane after that time.

22. EVIDENCE—PRESUMPTIONS—TRUSTEE'S DEED.—There is a presumption that a trustee's deed was made in accordance with the trust, and not in violation of it, since the law will not presume a breach of duty, especially after a long lapse of time; yet it is a presumption of fact which may be rebutted.

23. VENDOR AND PURCHASER— BONA FIDE PURCHASER — QUESTION FOR JURY.—In an action for rents and profits of a storehouse and lot, *held,* on the evidence, that whether a grantee from plaintiff's trustee or her grantee stood in the position of purchaser for value without notice of the trust was for the jury.

24. VENDOR AND PURCHASER—BONA FIDE PURCHASER.—In such case the right of a *bona fide* purchaser without notice of the trust arising under the recording act was a matter of legal defense.

25. TRESPASS—TRIAL—DIRECTION OF VERDICT.—In an action for the rents and profits of a storehouse and lot, where there was evidence warranting the inference that plaintiff's intestate had possession at the time of the entry by defendant, and that he had held adversely for more than ten years, the Court properly refused defendant's motion to direct a verdict.

26. JUDGMENT — CONCLUSIVENESS — EVIDENCE — JUDGMENT ROLL.—In an action to recover the rents and profits of a storehouse and lot, where the adverse possession of plaintiff's intestate was in issue, a judgment roll in an action by the intestate against a third party for rent was competent as tending to show the character of the intestate's possession at that time.

27. INSANE PERSONS — EVIDENCE — CAPACITY. — A deed executed by one holding title to the use of a named beneficiary, under a trust to convey to whomsoever he might direct, was admissible as tending to show capacity at the time on the part of the beneficiary, who was subject to periods of insanity; the presumption being that it was made in accordance with the trust.

28. Deeds—Execution—Attestation.—Attestation of the execution of a deed involves attestation of capacity to execute the deed.

29. Trial—Misleading Instructions.—An instruction that, if limitations had begun to run and a right of action had accrued to one in possession, it would not be suspended during his mental disability was misleading; as the jury might have understood that, if he had begun to hold adversely, no subsequent insanity would arrest the statute, without regard to whether he continued in actual possession, or to the character of his subsequent possession, or as to whether it was continuous for the full period of ten years.

Before Sease, J., Winnsboro, September, 1912. Reversed.

Action by William M. Cathcart, as administrator, etc., of the estate of John H. Cathcart, deceased, against John P. Matthews, continued after his death against J. E. Matthews and another, as his executors. Judgment for plaintiff, and defendants appeal.

*Messrs. McDonald & McDonald,* for appellants, submit: *Action cannot be sustained as one of trespass quare clausum fregit:* 28 A. & E. Enc. of L. (2d ed.) 573; 59 S. C. 131; 86 S. C. 361-366; 60 S. C. 401. *Either actual or constructive possession essential:* 28 A. & E. Enc. of L. (2d ed.) 573-575; note in 30 L. R. A. (N. S.) 243; 86 S. C. 358; 2 Hill L. 644; 3 N. & McC. 422 and 424; 1 Bail. 306; Rice L. 368; Dudley L. 340; 3 Strob. L. 465; 1 McMul. 449; 2. N. & McC. 363; 4 Rich. L. 104; 1 Hill L. 260; 2 Spears L. 451; 60 S. C. 400; 61 S. C. 293; 4 Rich. 105; 3 Hill L. 265.

Footnote.—As to sufficiency of possessory title to maintain action for trespass, see notes in L. R. A. (N. S.) 500, 503, 506. As to what temporary break in possession of land held adversely will amount to abandonment, see notes in 39 A. & E. Ann. Cas. 1916a, 606, 15 L. R. A. (N. S.) 1202. As adverse possession by a lunatic, see notes in 31 A. & E. Ann. Cas. 1914a, 39. As to intent as an ingredient in adverse possession, see notes in 15 A. & E. Ann. Cas. 827, 22 A. & E. Ann. Cas. 1912a, 450. As to presumption as to continuance of insanity, see notes in 4 A. & E. Ann. Cas. 491, 24 A. & E. Ann. Cas. 1912c, 388.

*Mere equitable title insufficient:* 1 N. &. McC. 369; 79 S. C. 473; 88 S. C. 184. *Adverse possession:* 1 Am. & Eng. Enc. L. (2d ed.) 795. *Permissive holding:* Code Civil Proc., sec. 126; 1 Cyc. 1039; 35 S. C. 609; 36 S. C. 56 and 322; 42 S. C. 50 and 63; 77 S. C. 129; 78 S. C. 513. *Plaintiff's possession lacks continuity:* Chev. L. 205; 14 S. C. 592; 29 S. C. 380; 26 S. C. 224-7; 48 S. C. 45; 50 S. C. 166-7; 64 S. C. 480-488; 69 S. C. 84-5. *Matthews established legal title:* Civil Code, sec. 3453. *Deed takes effect from delivery:* 9 Am. & Eng. Enc. L. (2d ed.) 152; Devlin Deeds, sec. 260-4; 1 Mills 190; 2 Strob. L. 306; 1 Strob. Eq. 347. *Record evidence of delivery:* 22 S. C. 371; 38 S. C. 397; 81 S. C. 455. *Payment of taxes evidence of claim:* Tiedeman Real Property, sec. 495; 16 S. C. 143; 78 S. C. 31. *Presumption as to possession:* Code Civil Proc., sec. 126; 25 S. C. 524; 48 S. C. 28; 65 S. C. 526; 71 S. C. 330. *Claim of title from common source:* 1 Hill L. 382; 49 Am. Dec. 381; 1 Strob. L. 1; 5. Rich. L. 541; 22 S. C. 133; 25 S. C. 453; 69 S. C. 78; 92 S. C. 187; 95 S. C. 484. *Plaintiff barred by statute of limitations:* 40 S. C. 168; 50 S. C. 127; 60 S. C. 172; 66 S. C. 293; 72 S. C. 319-320; 78 S. C. 154 and 324. *Also by presumption of a grant:* 5 Rich. L. 459; 2 Rich. L. 19; 71 S. C. 521; 17 S. C. 482; 4 Rich. L. 103; Riley's Eq. 102; 2 Rich. Eq. 99; 4 Rich. Eq. 152; 3 Hill 366; 1 Hill Ch. 380; 11 Rich Eq. 152; 31 S. C. 91; 72 S. C. 380; 80 S. C. 110; 36 S. C. 197; 20 S. C. 52; 11 Rich. 430; 14 S. C. 103; 120 U. S. 537; 175 U. S. 510. *Breach of trust does not prevent title vesting in the trustee's grantee:* 1 Perry Trusts (1st ed.), secs. 334, 335; 1 Strob. 45. *Rents follow as an incident to the legal title:* Perry Trusts (1st ed.), secs. 843, 844; 2 Pom. Eq. Juris., secs. 975, 979, 980; 1 Pom. Eq. Juris., sec. 219; 19 Am. St. Rep. 267; 64 Am. Dec. 197; 72 Am. St. Rep. 160.

*Messrs. Hannahan & Traylor* and *Glenn W. Ragsdale,* for respondent, cite: *As to motion for nonsuit:* 96 S. C. 153;

84 S. C. 299. *Issues for jury:* 2 McC. 268 and 289; 2 Bail. 321; 2 Hill 495; 3 Strob. 498; 64 S. C. 489; 62 S. C. 195. *Possession:* Cooley Torts (Student's ed), sec. 166; 1 Cyc. 987; 1 Am. & Eng. Enc. of L. 227. *Trespass quare clausum:* 70 S. C. 373; 86 S. C. 358. *Common source of title:* 92 S. C. 185; 97 S. C. 79; 71 S. C. 520; 62 S. C. 563; 48 S. C. 243; 1 Strob. 1.

September 5, 1916.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

This action was brought December 2, 1908, by plaintiff, as administrator of the estate of John H. Cathcart, against John P. Matthews, to recover $6,000, the rents and profits of a storehouse and lot in Winnsboro. At the first trial, in 1910, a verdict was directed for defendant, which was set aside on appeal. 91 S. C. 464, 74 S. E. 985, Ann. Cas. 1914a, 36. On the second trial, in 1912, plaintiff recovered judgment for $100, and defendant appealed. Matthews died in 1913, and the action was continued against his executors.

Divested of unnecessary verbiage, the material allegations of the complaint are: That John H. Cathcart was seized and possessed of the storehouse and lot described from November 2, 1867, until his death on January 1, 1908; that in 1871 he became insane, and remained so until death; that in 1884, while he was confined in the State asylum for the insane, Matthews entered and has used and occupied the premises ever since, the rental value of which is $6,000, which sum plaintiff is entitled to recover "for the use and occupation" thereof. The defendant pleaded a general denial, paper title in himself from the common source, *bona fide* purchase for value without notice, adverse possession, and the statute of limitations.

In 1866 Richard Cathcart, who is admitted to be the common source of title, executed a power of attorney to John H. Cathcart, which authorized him to sell and make good titles to all his real estate. On November 2, 1867, in execution of the power, John H. Cathcart conveyed the lot in question, with some other real estate of Richard's, to Mrs. M. J. Shaw, who was a sister-in-law of John's brother, Samuel. The consideration expressed was $1,500. On the same day Mrs. Shaw executed the following declaration of trust:

"I hereby acknowledge that I hold the real estate conveyed to me this day by Richard Cathcart for a full and valuable consideration paid by John H. Cathcart, subject to such uses as John H. Cathcart may direct, hereby binding myself to make such conveyances as John H. Cathcart may at any time require of me."

On June 22, 1874, Mrs. Shaw, by separate deeds, conveyed the lot in question, with some others, to Elizabeth Cathcart, the widow of John's half brother, Robert, and the residue of the property that had been conveyed to her by John under the power to Mrs. Ellen Cathcart, Richard's widow. The consideration expressed in each deed was $800. On October 16, 1884, Elizabeth Cathcart conveyed the lot in question to Matthews. The consideration expressed and paid was $650. These deeds were in the usual and regular form, with full covenants of warranty, except those from Mrs. Shaw, who warranted only against herself, her heirs and assigns; and they were all duly recorded, except the declaration of trust, which was never recorded, nor was it mentioned or referred to in any of the deeds. It was found among the papers of John H. Cathcart after his death, as was also the deed from Mrs. Shaw to Elizabeth Cathcart.

In October, 1871, John H. Cathcart became insane, and was confined in the asylum until about Christmas of that year, when he was discharged and returned home and

resumed the conduct of his business. He had a large mercantile business, and owned considerable real estate. He was taken to the asylum again in the latter part of 1873 or the early part of 1874, and kept there a short time. On June 30, 1874, on petition, filed in the probate Court June 23d by his brother, Samuel, and his brother-in-law, Dr. Madden, it was adjudged that he was a lunatic. His brother, Samuel, was appointed committee of his person and estate, and he was again committed to the asylum, where he was kept until May, 1875, when he was again discharged. In April, 1876, on his own petition, it was adjudged that his mind was restored, the proceedings in lunacy were superseded and his committee was ordered to turn over to him his property. In April, 1883, he was again adjudged to be a lunatic and was sent to the asylum, where he remained until his death, with the exception of a leave of absence for a few weeks which he spent at home.

John McIntyre, a witness for plaintiff, testified that he occupied the storehouse in question, as tenant of John H. Cathcart, from about 1870 until 1874 or 1875; he could not give the exact date of the beginning or ending of his tenancy; that he rented from John H. Cathcart by the year, at $200 a year, and knew no one else in the transaction; that he paid the rent when he was at home, and when he was in the asylum he paid it to the clerk of the Court for him, and that he settled with him for the balance due him on his return from the asylum in May, 1875, and turned the key over to him.

There apears to have been a short interval—exactly how long the testimony does not disclose—after McIntyre quit before Cathcart himself took possession, which he did in person in May, 1875, and retained possession, doing a small business therein, until he was sent to the asylum in April, 1883. From that time until Matthews took possession, October 16, 1884, the store was unoccupied, except for a few months in the summer of 1883, when Mr. D. R. Flen-

niken put some oats in it by permission of Dr. Madden, Cathcart's brother-in-law. There was testimony that, when Cathcart was taken to the asylum in 1883, he left some books in the store, and that they remained there until they were thrown out about the time Matthews took possession, and that until then the store was locked, and Cathcart had the key. But Mr. Flenniken and other witnesses testified that it was open, when he put his oats in it, and that he put a lock on the door, and, when he vacated, he gave the key to Dr. Madden.

It is difficult to determine from the allegations of the complaint what kind of an action this is or was intended to be. The allegations are most appropriate to an action for the recovery of rents, or for the use and occupation of the store. Plaintiff's attorneys so regard it. In their argument they say:

"Of course, the present action is not the technical action of trespass *quare clausum fregit.* It is an action for the recovery of rents and profits."

And, although the defendants, too, so regard it, they have not made the point that the evidence will not sustain such an action, except upon the ground that the evidence fails to prove that plaintiff's intestate had the legal title; their contention being that it is an action for rents and profits, and that such an action can be maintained only by the holder of the legal title.

While some of them are not material to this appeal, yet, as there will be another trial, where different contentions may be made, it is deemed best to call attention to some of the erroneous positions taken by counsel. An action 1–3 for rents or for use and occupation of land rests upon contract, express or implied. *Ryan* v. *Marsh,* 11 S. C. L. (2· Nott & McC.) 156; *Boston* v. *Binney,* 11 Pick. (Mass.) 1, 22 Am. Dec. 353, 39 Cyc. 850. Therefore, if this must be regarded as such an action, on proper objection taken, it must fail; for there is no evidence of any

contract, nor of facts from which the law will imply one. The possession of Matthews was either rightful, under his deed, or became so by adverse possession for ten years, or it was tortious *ab initio* and remained so.   If his deed conveyed the legal title to him, his entry and possession thereunder was not tortious; for the true owner of property who also has the right to possession may take possession whenever and wherever he can do so, without committing a breach of the peace. *Simmons* v. *Parsons,* 11 S. C. L. (1 Bailey) 62; *Myers* v. *Myers, Id.* 306.   The jury were so instructed in defendant's seventh request.   But if his entry ·was tortious and remained so, *Ryan* v. *Marsh, supra,* squarely decides that an action for rents and profits or for use and occupation cannot be maintained upon it.

. The contention of defendants that an action for rents and profits cannot be maintained except by the holder of the legal title is clearly unsound.   The right to the possession of land, whether legal or equitable, coupled with possession in fact, ordinarily carries with it the right to rent it and collect the rents.   And an equitable right to possession, coupled with possession, is sufficient to sustain a legal cause of action for trespass thereupon.   38 Cyc. 1025.

Notwithtanding the action cannot be maintained, under the proof, as one for rents and profits, nevertheless, by a very liberal construction of the complaint, enough may be gathered to make out a cause of action for trespass.   Title and possession are alleged in plaintiff's intestate and a wrongful entry thereupon by Matthews, which is sufficient for an action of trespass *quare clausum fregit. Investment Co.* v. *Lumber Co.,* 86 S. C. 358, 68 S. E. 637, 30 L. R. A. (N. S.) 243.   True, no damage is alleged, but the law will presume damage from the trespass.

Appellants contend that the action cannot be sustained as one of trespass *quare clausum fregit,* not on the ground that the right of action, being for tort, did not survive, for that

objection is removed by the statute (section 3963, vol. I, Code 1912), but on the ground that Cathcart was not in possession when Matthews entered. It is well settled that to maintain such an action plaintiff must prove that he was in possession, actual or constructive, when the trespass was committed.

This brings us to the questions which appellants make as to Cathcart's possession and the nature of it: First, whether · it was such as will sustain an action of *quare clausum fregit;* second, whether it could have been adverse, and, if so, when such possession could have commenced; and, third, whether it was continuous for the full statutory period. The discussion will be confined to the second and third questions; for it must be conceded that, if possession be such as is required to ripen into title, it is sufficient to sustain the action.

The Court instructed the jury that Cathcart's possession could not have been adverse to the trustee prior to her conveyance to Elizabeth Cathcart, on June 22, 1874. This was correct; for, by the terms of the trust, she was to hold the property subject to such uses as he might direct. The actual use of. it by himself was in contemplation of law his direction that he be allowed to use it. Adverse use presupposes such a trespass as will give rise to a cause of action. It is inconceivable how the use of the property by Cathcart could have given the trustee a cause of action. If she had attempted to eject him, he could have defeated her action by merely saying, I direct you to allow me to use it. *Whiting* v. *Whiting,* 4 Gray (Mass.) 236.

Moreover, if the conveyance to Elizabeth Cathcart was directed by John H. Cathcart, and, if he was capable, at the time, of understanding the nature of the · transaction, his possession after that date must, as matter of law, be held to have been under and in subordination to the title so conveyed, and not adverse to it, because he would be estopped by his act to claim against the grantee,

unless there was afterwards a distinct disavowal of the act and deed, and an unequivocal assertion of right in himself, and notice thereof to the grantee, of which there is no evidence. *McCutchen* v. *McCutchen, 77* S. C. 129, 57 S. E. 678, 12 L. R. A. (N. S.) 1140; *Love* v. *Turner, 78* S. C. 513, 59 S. E. 529, 1 Cyc. 1039, 2 Corpus Juris 143.

But if he did not authorize that conveyance, his subsequent possession may have been adverse to the grantee, or it may be referred to his rights under the trust; for, if the grantee purchased with notice of the trust, she took subject to it, and became a constructive trustee. 1 Perry on Trusts, sec. 334.

"It has been said that, if there be one element more distinctly material than another in conferring title by adverse possession, where all requisites are so, it is the existence of a continuous adverse possession. There must be such continuity of possession as will furnish a cause of action for every day during the whole period required to perfect title by adverse possession." 2 Corpus Juris 82; *Porter* v. *Kennedy, 26* S. C. L. (1 McMul.) 354; *Hill* v. *Saunders, 40* S. C. L. (6 Rich.) 62; *Massey* v. *Duren, 3* S. C. 34.

It is well settled that a lunatic is liable in a civil action for actual damages for such of his torts as do not involve intent as a necessary ingredient. 16 A. & E. Enc. L. (2d ed.) 622; 22 Cyc. 1211. It follows that for every day that Cathcart had possession the holder of the legal title had a cause of action against him, if his possession was wrongful.

Under the principle above stated appellants contend that, even if Cathcart's possession was adverse, there were two breaks in it, either of which would have prevented his acquiring the title: First, from the time McIntyre went out, say, in January, 1875, until Cathcart went in, in May, 1875; and, second, when Cathcart was taken to the asylum in April, 1883.

The rule requiring continuity of possession does not mean that the person in possession, his tenant or agent, must be actually on the land during the whole of the statutory period. Actual possession, once taken, will continue, though the party taking such possession should not continue to rest with his foot upon the soil, until he be disseised, or until he do some act which amounts to a voluntary abandonment of the possession. *Grimke* v. *Brandon,* 10 S. C. L. (1 Nott & McC.) 356; *Cleveland* v. *Jones,* reported in a note in 34 S. C. L. (3 Strob.) 479; *Wilson* v. *McLenaghan,* 16 S. C. Eq. (McMul. Eq.) 35; *Mahoney* v. *Ry.,* 82 S. C. 215, 64 S. E. 228. In *Mahoney* v. *Ry.,* the Court quoted with approval from the opinion in *Wilson* v. *McLenaghan,* as follows:

"Where the occupant of land leaves it for a time *animo revertandi,* his possession continues during such occasional absence; and so, I apprehend, if a tenant quits the premises, the landlord is to be regarded as still in possession, if by taking possession within a reasonable time, or putting in another tenant as soon as one can be procured, he gives evidence that he does not intend to abandon the land. Here the tenant went out when the crop was gathered, and the landlord went in at the season of the year when planting operations usually begin. Possession is matter of fact, and, therefore, of evidence; and here was no greater evidence of abandoning possession than would exist where a planter withdraws his hands from one plantation to another during the winter and returns them in the spring; a thing that often occurs, without the slightest suspicion that the possession has been relinquished."

See, also, 2 Corpus Juris, 93, 94, 112; *La Frombois* v. *Jackson,* 8 Cow. (N. Y.) 589, 18 Am. Dec. 463; *Schwartz* v. *McQuaid,* 214 Ill. 357, 73 N. E. 582, 105 Am. St. Rep. 112; *Hamilton* v. *Boggess,* 63 Mo. 233; *Holman* v. *Herscher* ('Tex.), 16 S. W. 984; *Holliday* v. *Cromwell,* 37 Tex. 437; *St. Paul* v. *Chicago etc. Ry.,* 45 Minn. 387, 389, 48

N. W. 17; *McCaughn* v. *Young,* 85 Miss. 277, 294, 37 South. 839.

In *Cleveland* v. *Jones* plaintiff became insane in 1810, while he was in actual possession, and remained so until after 1830. While he was insane his children divided his estate amongst themselves. The part in question had been sold and resold a number of times, and was finally bought by Jones in 1829. Having recovered his mind, plaintiff brought an action of trespass *quare clausum fregit* against Jones, who was then in possession, and his action was sustained.

In *La Frombois* v. *Jackson,* plaintiff, having taken and held adverse possession before the Revolutionary War, was driven off by the British army, and continued in involuntary exile during the war, but, on the restoration of peace, returned and rebuilt his house. Held, all the Judges concurring, that his absence, occasioned by the war, did not break the continuity of his possession.

In *Hamilton* v. *Boggess* plaintiff was compelled to leave his farm in 1863 by a military order issued during the Civil War, which he could not resist, but returned and resumed possession in 1866, as soon as he was permitted. Held, that his absence was not such an interruption of his adverse possession as would break its continuity.

The authorities above cited show that there may be actual possession without actual occupancy during the whole of the statutory period, either in person or by tenant, and they further show that possession is a matter of fact, and, therefore, that the Court did not err in leaving it to the jury to say whether Cathcart's possession was interrupted at either of the times mentioned.

Abandonment involves intention, and when the evidence is susceptible of more than one inference, the question of

intent is one of fact for the jury; so, also, in this case, it was a question of fact whether Cathcart was capable of forming such an intent, as was also the question whether he was capable of forming and did form the intent to hold the possession adversely, and whether he was capable of directing, and did in fact direct, the conveyances made by Mrs. Shaw on June 22, 1874.

It is well settled that a man may be insane on one subject, but capable of transacting business on all others. There may be a partial derangement; yet capacity to act on many subjects may exist. The question in any case is not merely whether the party was insane at the time of the questioned transaction, but whether he was so insane as to be incapable of doing the particular act with reason and understanding; that is, was he capable of comprehending the nature and effect of the transaction? 16 A. & E. Enc. L. (2d ed.) 624, 22 Cyc. 1170.

Neither Cathcart's confinement in the asylum nor the several adjudications of his lunacy is conclusive of the fact of incapacity. The adjudications are not conclusive even upon him or his privies, because he was not formally a party to either of them. They were *ex parte.* For the same reason, they are not binding on defendants. They are only *prima facie* evidence of the fact. *Cathcart* v. *Sugenheimer,* 18 S. C. 123. The adjudication of July, 1876, that he was sane at that time stands on a different footing, and is conclusive against him and his privies, because he was a party to it. But, of course, it would not preclude proof that he became insane after that time.

Appellants erroneously assume that, if Cathcart did not acquire title by adverse possession, he had no right whatever in the premises upon which this action can be sustained. If the deed from Mrs. Shaw to Elizabeth Cathcart was made without his authority, his possession thereafter may be referred to his rights under the trust, unless the grantee was an innocent purchaser for value with-

out notice of the trust, for, notwithstanding there is a presumption that the deed was made in accordance with the trust, and not in violation of it, since the law will not presume a breach of duty, especially after such a long lapse of time, yet it is a presumption of fact which may be rebutted; and, as there was *prima facie* evidence of Cathcart's incapacity to direct the conveyance at the date thereof, the Court could not have held, as matter of law, that defendants had shown conclusively that Matthews had a good conveyance from the trustee. Therefore the question whether Elizabeth Cathcart or her grantee, Matthews, occupied the vantage ground of purchaser for value without notice of the trust was one of fact. It was also matter of defense, and, as it arose under the recording act, it was a legal defense and triable by jury. *Smyly* v. *Cypress Co.,* 95 S. C. 347, 349, 78 S. E. 1026, and cases cited.

It follows that, as there was testimony warranting the inference that plaintiff's intestate had possession at the time of the entry by Matthews, and that he had held adversely for more than ten years, the Court properly refused defendants' motion to direct the verdict. *Martin* v. *Burgess,* 63 S. C. 423, 41 S. E. 450.

The witness, McIntyre, testified that Cathcart rented a shed room to the store to C. Muller and sued Muller for the rent. In reply to this defendants offered the judgment roll in the case, which showed that the suit was brought in the name of Richard Cathcart. In the record there was a statement of the account for rent against Muller in favor of Richard Cathcart in the handwriting of John H. Cathcart. It was for the balance due for 1866 and the rent for 1867, "as per contract made with John H. Cathcart." The Court admitted the statement of account as a declaration against interest, but excluded the judgment roll on the ground that it was *res inter alios acta.* While the judgment roll was competent as tending to show the character of Cathcart's possession at that time, and as tending

to show that the knowledge or recollection of the witness was not accurate, standing alone, its exclusion, under all the circumstances and the other evidence in the case, could not be said to have been so prejudicial as to require reversal of the judgment.

Defendants also offered the deed from Mrs. Shaw to Mrs. Ellen Cathcart, which was excluded as incompetent. This was prejudicial error. The deed was competent and relevant, because it tended to strengthen the presumption that the conveyances of June 22, 1874, were made in accordance with, and not in violation of, the trust. It also tended to show capacity on the part of John H. Cathcart to authorize the conveyances, just as any other business transaction of his at or about the same date might have been proven for the same purpose.

One of the witnesses to the deed was Col. James H. Rion, an honorable and distinguished member of the bar, who was also the attorney for John H. Cathcart. He had witnessed the deed from Richard Cathcart, by John H. Cathcart, his attorney in fact, to Mrs. Shaw, and the declaration of trust was in the handwriting of Col. Rion. Therefore he is presumed to have been cognizant of it, and of the rights of John H. Cathcart under it, and it was inferable from the fact that he witnessed both the deeds made by Mrs. Shaw on June 22, 1874, in which she undertook to dispose of the entire trust estate, that he would not have taken part in the transaction, unless John H. Cathcart had authorized it, and unless he thought him capable of doing so. Attestation of the fact of execution of a will involves attestation of testamentary capacity. *Kaufman* v. *Caughman,* 49 S. C. 159, 27 S. E. 16, 61 Am. St. Rep. 808. There is no reason why the same principle should not apply to the attestation of deeds. Of course, the weight to be given such evidence depends upon a variety of circumstances and is for the jury.

The Court charged in the language of Mr. Justice Woods on the former appeal:

"I do not think the proposition sound that John H. Cathcart could not hold by adverse possession while he was *non compos* or in the lunatic asylum. If any person (other than the true owner) entered or being already in held under John H. Cathcart while he was a lunatic or in the asylum, the possession of such person would inure to the benefit of the lunatic."

To this the Court added:

"If the statute had begun to run, that is, the right of action had accrued to John H. Cathcart, in his favor, the statute would not be suspended during his disability."

The added proposition was erroneous and misleading. No doubt, the learned Judge had in mind the general rule that, when the statute begins to run against a party, it will not be suspended by his subsequent disability. But the jury may well have understood the Court to mean that, if Cathcart had begun to hold adversely, no subsequent disability of lunacy would arrest the statute, without regard to whether he continued in actual possession, or to the character of his subsequent possession, or to whether it was continuous for the full period of ten years. As we have already seen, defendants earnestly contended that his possession was interrupted on two occasions—first, between January and May, 1875, and, second, when he was taken to the asylum in 1883—either of which would have prevented his acquiring title by adverse possession. But, as has been shown, it was a question of fact for the jury to say whether on either occasion his actual possession was interrupted.

Moreover, defendants proved that in 1883, after Cathcart was taken to the asylum, Mr. D. R. Flenniken took possession of the store and used it for several months by permission of Dr. Madden, the brother-in-law of Cathcart, and also a relative by marriage of Mrs. Elizabeth Cathcart.

Now, clearly, it was a question for the jury whether Mr. Flenniken's possession was under John or Elizabeth Cathcart, and that would depend upon whether Dr. Madden was the agent of one or the other. If it was under John, it inured to his benefit; but if it was under Elizabeth, it was such an interruption of John's possession as to prevent his acquiring the title, if the full ten years had not elapsed when Mr. Flenniken took possession. But, under the instruction given, the jury may have concluded that the statute continued to run in his favor notwithstanding his actual disseisin. The language complained of was not used with reference to the right of action in favor of Cathcart by reason of the entry of Matthews, while he was in the asylum, as to which it would have been more appropriate, though not entirely sound, but it was used while the Court was instructing the jury with regard to the possession of John H. Cathcart, as to which, if it was adverse, no right of action had accrued in his favor, but against him. If the proposition stated were sound, one who takes adverse possession of the land of another and holds it for one day and then becomes insane would acquire the legal title after the lapse of ten years, without regard to subsequent events—such, for instance, as whether he continued in possession, and the character of his possession, and whether, during the statutory period, he should be disseised by the owner or a third person—which clearly is not sound law.

Immediately following the instruction complained of, the Court gave defendants' first request, which set out at length and in detail all the necessary elements of adverse possession, and added:

"I charge you that in connection with what I have already charged you about the disability of a lunatic."

What has already been said shows that the modification of the request was erroneous and misleading.

Judgment reversed.