## WILLIS v. PENNSYLVANIA R. CO.
### Civil No. 739.

District Court, E. D. New York.

Dec. 5, 1940.

Thomas J. O'Neill, of New York City (Thomas J. O'Neill and Jeremiah J. Riordan, both of New York City, of counsel), for plaintiff.

Burlingham, Veeder, Clark & Hupper, of New York City, for defendant.

BYERS, District Judge.

On October 25, 1940, the plaintiff recovered a verdict for the death of her husband, which the defendant moved to set aside as being contrary to the law and the evidence, and for a directed verdict; as to both of which motions decision was reserved pending the receipt of briefs and the testimony in the case. All papers were filed on November 9, 1940.

There was a prior trial during the month of June, 1940, which resulted in a disagreement, following which a motion for a directed verdict in favor of the defendant was denied and a new trial was ordered.

At the former trial, as on this, the defendant rested at the close of the plaintiff's case, and it seems that the plaintiff now contends that the present trial judge is relieved of responsibility for deciding the

pending motions, by reason of the order entered by Judge Galston, who presided at the first trial.

The point is not free from difficulty, since the plaintiff's evidence was the same at both trials (with one inconsequential exception) and consisted of the testimony of several of the decedent's fellow employees, taken under deposition.

The earlier ruling to which I was required to defer on the trial was that a verdict would not be directed for the defendant, which seems to be the equivalent of a decision that a motion to dismiss at the close of the plaintiff's case could not be granted, as a matter of law. See Commercial Union of America v. Anglo-South American Bank, 2 Cir., 10 F.2d 937; In re Hines, 2 Cir., 88 F.2d 423.

Judge Galston was dealing with a mistrial caused by the failure of the jury to agree, and nothing appears in his opinion to the effect that he would regard himself as bound to allow the verdict of the jury to stand if he should preside at the second trial, or that he anticipated that any other judge of this court could not deal with a motion to set aside a plaintiff's verdict, should one be reached, according to the then apparent legal necessities of the case.

The responsibility of deciding this motion on the merits would be willingly relinquished if the "law of the case" has been established as the plaintiff argues; but the provisions of Federal Rules of Civil Procedure, rule 50(b), 28 U.S.C.A. following section 723c, seem to indicate that no such evasion of responsibility is permissible.

If the prior decision should be interpreted to mean that, on the undisputed evidence, a judge conducting the second trial must permit a verdict to stand, then the above section of the Rules to that extent would be ignored; while, if the latter be deemed to control the present exercise of judicial function, it is apparently argued that there is a departure from the earlier ruling.

If a choice between these positions is indeed required, it will be that the responsibility placed upon the court by the Federal Rules commands priority.

The plaintiff's testator, George S. Willis, was a signal maintainer in the defendant's employ, and had been for many years. He was an experienced man and his record is unimpeached; he met his death on August 25, 1939, at about 8:45 a. m. (the weather being clear) while in the company of Myers, his subordinate as a signal maintainer, and trackman Donofrio, in the reclassification freight yard of the defendant company at Enola, near Harrisburg, Pennsylvania.

That he was struck by a loaded box car being ridden by Van Camp, a brakeman, which was moving westerly by gravity at a speed estimated to be about ten miles an hour, from the Hump past the switch known as No. 14, and onto track 15; and that he died that day as the result of his injuries, are not in dispute.

That Willis, Myers and Donofrio were in a group at Switch 14, engaged in a task pertaining to their customary occupation, is also conceded.

What each man was doing is the subject of argument by the plaintiff, who asserts that the testimony of Myers and Donofrio was in part contradictory, or was to be discredited in part, because of their continuance on the defendant's employment roster, whereby the jury would have been justified in refusing to believe their narratives and in concluding that there was deliberate falsification by them in certain material respects.

Seemingly the plaintiff argues that the verdict must be deemed to have decided not only that these men were untruthful, but that the converse of certain of their testimony must have been true, and that therefore the verdict must be sustained; for instance, their testimony that Willis was to do the watching for moving freight cars must have been repudiated by the jury, and have been interpreted as establishing that Willis was *not* acting as the lookout, and therefore, although there was no testimony other than that of Myers and Donofrio on the subject, the verdict may not be set aside.

The foregoing states the plaintiff's position rather baldly but the argument made for her comes to that.

The car which did the damage moved westerly from the Hump, as has been stated, and followed another at a distance of about three car lengths, or 120 feet; the leading car was diverted at Switch A, 355 feet east of Switch 14, to enter track 21, to the north of tracks 14 and 15, which in turn were controlled by Switch 14.

Van Camp's car, therefore, had to cover 355 feet before arriving at the place where the men were working, but it also had to pass Switch B, 115 feet easterly therefrom, at which it could have been diverted to

tracks 11, 12 and 13, to the south of Switch 14, so that the actual destination of this car, namely, track 15, could not have been known with certainty to men standing at or near Switch 14 until Switch B was passed. In other words, the offending car had to travel 240 feet, which would require 16 seconds at a ten mile speed, while the men working at Switch 14 moved aside into the "six foot" (the space between the tracks) so that the car could pass to track 15 without injury to themselves.

Track 14 was closed that morning at about 8 o'clock, at the request of Donofrio, who was sent to the Hump office by Willis to notify the Assistant Yardmaster and the Switchman in that office of the necessity for closing it to traffic because Switch 14 needed repairs. This means that they knew that the repair work would shortly commence and that thereby track 14 would be out of service, but that track 15 would remain available to receive cars. That is so because, when Switch 14 was spiked or blocked so as to remain open, cars could pass onto track 15 but not to track 14.

It is apparent that this understanding was common to the switchman in the yard office and to Willis, Myers and Donofrio, who had the work in charge.

The specifications of negligence, as distilled from the plaintiff's answers to interrogatories and her briefs on this motion, are:

1. That the defendant should not have permitted any freight cars to pass Switch B, which means that all tracks controlled by Switch 14 should have been put out of service, namely, tracks 14, 15, 16 and 17. This will be discussed.

2. That Van Camp, riding the offending car, failed to give any warning or signal to these men as his car approached Switch 14. This was impossible, as the testimony shows.

3. That the switchman in the Hump office who operated this set of switches, namely, A, B and 14, failed to give these men any warning of the approach of Van Camp's car. No necessity therefor is shown by the testimony.

4. That the defendant "failed or omitted to make and promulgate rules and regulations requiring the giving of a signal or warning to men at work in connection with switches before operating cars over or in the vicinity of said switches, and requiring that a watchman, provided with a whistle and flag, be stationed at a reasonable distance from said men to warn them of the approach of cars, and warn the brakeman or persons riding upon said cars of the presence of men upon the tracks." This will be discussed.

5. That "the defendant failed to make or promulgate a rule requiring the tower operator, car rider, or other employee, to give some notice to men working in connection with switches before operating cars over or in the vicinity of said switches". This will be discussed.

As has been said, the testimony of Myers, Donofrio, Van Camp and other defendant witnesses was taken by the plaintiff under deposition at Harrisburg, and read to the jury. That method was chosen by the plaintiff, who of course could have brought her suit in Pennsylvania and subpoenaed the witnesses to appear in court.

The plaintiff's attempts to discredit the testimony of these witnesses depended rather upon insinuation than direct statement, and was conducted with some adroitness so far as the summation was concerned; therefore, a proper disposition of this motion requires a careful scrutiny of their depositions and all that can be gathered therefrom, in the effort to appraise the true value of their testimony.

### Donofrio.

He had been a trackman for twenty-two years and was seriously injured by the car that struck Willis, and in April of 1940, when his testimony was taken, was on sick leave. This is understood to mean that he is still in the defendant's employ and presumably in receipt of some compensation, but as to that there is no evidence.

On the morning in question, the work at Switch 14, which engaged the attention of these three men, was renewing a rod to put the switch in better condition:

"Q. What was wrong with it? A. Why, 6 inch open space, to reduce it to 5. You know they wear out, the bolts and rods, had to change it and put them in the place it was before."

The job would take from twenty minutes to half an hour, depending upon "how the cars are coming down and how long it takes to get it done". The switch was blocked straight, shutting off track 14 but leaving the other track open for traffic.

"Q. So you and Myers and Willis were working at that switch? A. Two of them was working, one was watching.

"Q. Who was working? A. Me and Myers and George was watching."

As to the average speed of the freight cars moving as this one was:

"A. I would say about 10, that is all I think. I don't know. I never—

"Q. Did you say 10 to 15 before? A. Yes, 10 to 15. Some of them pick up speed, some of them not, you know."

The witness was swinging a sledge hammer to cut bolts and Willis was standing in the "six foot" when the job began.

"Q. And was he (Willis) standing right alongside of you? A. Right alongside. When we start work he was watching. I don't know what he was doing after that. I don't know."

"Q. While you were there working, who was your boss? A. Why, George Willis was boss then. No is boss there, everybody help."

He did not see the car until it was two feet away, then it hit him, and he just went over and knew nothing afterwards. He was standing between the rails and Myers was holding the punch and was standing outside the tracks while the witness was standing inside, swinging the sledge. He heard no warning from anybody before he was struck.

Before giving his deposition and on his way to the place where it was taken, the witness stopped in at the office of Mr. Jones, the Claim Agent for the Railroad Company.

"Q. (By plaintiff's counsel) While you were there did anybody speak to you about how this accident happened? A. No, sir."

While the witness was in the hospital after the accident to him, he gave a statement to the Railroad and, while so in the office of Mr. Jones, the defendant's counsel read that statement over to the witness and was asked questions about it and answered them.

Before Willis sent this witness to the Hump office to ask to have track 14 closed, they were doing some work at this switch, called "fixing the chair".

"Q. While you were fixing this chair, as you call it, did any cars come down on this track? A. Yes, they did.

"Q. And did anybody warn you that they were coming, tell you that they were coming? A. Yes, George was there watching.

"Q. He told you that they we: coming— A. George did say."

That the foregoing contradicted what the witness had said on direct examination is argued but not demonstrated.

A reading of the testimony creates the impression that the witness was confused by the form of the questions as to whether reference was made to incidents prior to his being sent to the Hump office to procure the closing of the track or after he returned, both as to what Willis may have said and as to whether freight cars came down and passed the place where they were working.

### Myers.

This witness was on furlough at the time his deposition was taken. He had been in the employ of the defendant for thirty years and was not working when his testimony was taken. He was merely loafing around, and said: "I am drawing a little bit of social security from the government. That is what I am doing now."

On the day in question, he was a helper in the Signal Department, working with Donofrio and Willis, and reported at 7 o'clock. All three went to Switch 14, reaching there about 7:30, where they tightened up some rail braces, and during that time cars came down that way. As the cars are cut off and roll down the Hump, they attain a speed of from six to ten miles anyhow. Some cars roll faster than others; they might go from ten to twelve along there.

When Donofrio returned from the Hump office, they spiked the switch; that is, put it in a straight direction, so that cars could go on tracks 15, 16 and 17. When the switch is set for cars to enter track 14, it is called "reverse".

"Q. Now, until a car coming from the Hump going west gets to Switch B, you are working at Switch 14, you can't tell whether or not it is coming down to Switch 14 or whether it is going down on tracks to the south of 14, in the south end of the Yard? A. You can by the color of the light, sure."

Just before the accident, the witness was stooping over the north rail, facing west (away from the Hump).

"Q. Where was Willis standing? A. Well, he was standing—with Tommy (Donofrio), he was striking for me, he was right next to me.

" * * * Willis was standing right west of Tommy."

Four or five minutes before the accident, Willis was turning the air off the switch. No other cars came down after Donofrio returned from the Hump office, but they had come down before, while the rail braces were being tightened. Just before the accident, he happened to look over his shoulder and hollered: "Look out" and leaped out of the way of the oncoming car. He saw both of his companions hit. Willis was standing between the rails. The car might have been five or ten feet away at the time Myers jumped.

"Q. Was anybody doing any watching to warn you men? A. The only thing, Willis he was supposed to watch. He was watching there while we were down there pounding this bolt out.

"Q. Was anybody between the three of you, was anybody to do any watching, or was it necessary to have watching? A. Not besides the three of us. No, sir, there was nobody.

"Q. Was any one of the three to do any watching? A. Sometimes either one of us would do the watching for—there was no one else around to watch.

"Q. There was no one at that time appointed to watch? A. No."

It was understood that they would have about a half an hour to do the job.

"Q. By that did you understand that no cars would come down there? A. No, we didn't understand it that way. We knowed there would be cars coming down that way.

"Q. When you were working on that switch after Donofrio had gone up to the Hump office were not the cars supposed to be switched away from Switch 14? A. No, sir."

By blocking Switch B, no cars could have come down where these men were working.

"Q. Is there any custom in the Yard as to what is done with switches and what switches are blocked, when you men are working there on repairing it, or repairing the switch? A. You mean what custom is it? The custom is just what we went through. That is the only custom I can tell you.

"Q. Well, is it customary to block the switch leading into the ladder track (14) on which you are working so that no cars can come in there at all so that you have a safe place to work? A. It depends on what kind of work you are doing, the way you block it out."

"Q. On other occasions while working on switches in that Yard was the switch before the one on which you were working blocked so that cars could not go in and come down on the track on which you were working? A. There was some, yes sir, at other times. Yes.

"Q. How often was that done? A. I can't say how often it was done, but it was done before this.

"Q. And was that a customary thing to do? A. Well, it is customary to do it when you have any work to do on your switch.

"Q. And you had work to do on the switch at this time, didn't you? A. Yes sir."

As has been stated, Switch B was not blocked. The witness explained the use of car retarders in connection with the eastbound hump, which slow the cars down, i. e., retard them automatically, but they are not used in the westbound Yard.

This witness helped to lift Willis to the stretcher when the ambulance arrived.

He signed one or two statements; the first on the day of the accident, and the second somewhat later, but had spoken to no one from the Railroad in the interval. Before giving his deposition, he stopped in the same Mr. Jones' office and talked about how the accident happened, to defendant's counsel.

On cross-examination, the following occurred:

"Q. You said that on some other occasions the switch further up in the Yard was blocked off so that the cars didn't come down onto the track where you were working. On those other occasions were you doing work which put that track in such condition that cars could not run over it? A. What I mean, these other occasions might be some other day's work, that is, I mean other occasions. I don't mean the occasions that day, but on other occasions maybe other days, maybe a month before that.

"Q. You were doing a different kind of work? A. Doing a different kind of work.

"Q. And doing a kind of work which put the track in such condition that cars could not run over it? A. That is right.

"Q. And then they closed the switch up there so that the cars could not come down? A. That is right.

"Q. But the work that you were doing on track 14, or Switch 14 at this time was of such a nature that cars could go down on the others, 15, 16 and 17? A. That is right.

"Q. And you expected that they would? A. Yes sir."

Referring to Willis, the witness said that, after he had turned off the air as stated, he was standing west of the other two on the track.

"Q. He was just standing there? A. Yes.

"Q. Now, in connection with this work the men that were working could not watch and didn't watch, did they? A. No sir.

"Q. And the men who were not working— A. The man who was not working did the watching, yes sir.

"Q. And you and Donofrio did the work? A. Yes sir.

"Q. George Willis was not working? A. He was standing west of us on the track.

"Q. And he was watching? A. He was there watching, yes sir. * * *

"Q. Did you talk among each other as to how you felt? A. Well, George said he was not feeling so good. Tommy and I both said, 'Well, George, you watch. Tommy and I will do the work.' That is just the words we said."

It was stipulated that the plaintiff would testify, if called, that she observed no indication of illness on the part of her husband when he left for work that morning, and that he did not complain of his physical condition to her.

That is the sole addition to the evidence taken at the first trial.

It is accepted, but of course does not contradict what Myers and Donofrio deposed. A man does not always complain of his feelings to his wife, and if he "did not feel so good" at around 8 o'clock, the cause may have manifested itself after he left his home.

"Q. Now, while you were doing this preliminary work, and before Donofrio went up to get the switch for you, or get the 14 track for you, other cars came down on this track? A. Yes sir.

"Q. And at those times was George Willis acting as watchman? A. Yes sir.

"Q. And he called to you when the cars came down? A. He would blow a whistle, and holler, 'Look out for the cars', something like that.

"Q. He had a whistle? A. Yes sir.

"Q. You were George Willis' helper? A. Yes sir."

These three men worked on about a half a dozen switches (numbers 1 to 12) a day or so before the accident.

"Q. While that work was being done the men that were working did the work and one of the men did the watching? A. Yes sir, that was the custom."

The witness had replaced many switch rods and, when that type of work was being done, it was the regular practice to block off the track controlled by that switch, but cars continued to come on the other tracks.

On re-direct and in reference to the practise on other occasions, the following occurred:

"Q. Is it or is it not a fact that on other occasions when you were doing the same kind of work that you were doing here that you blocked the switch ahead of the one you were working on? A. No.

"Q. Isn't that what you said? * * * A. No sir. * * *

"Q. Didn't you say that on direct examination? A. What I meant by that— the way I wanted to say when I said that to you, on other occasions you had work to do on other switches it might be a week after that, something like that, you had occasion to block a switch out, sure you got that, but I didn't say you had occasion— well, go ahead.

"Q. Finished? A. No, that is all. * *

"Q. Isn't it a fact that nobody was doing any watching here? A. Well, in fact there was nobody watching or nobody would have got hurt, that is a cinch.

"Q. Isn't it a fact that there was no agreement between you as to anybody doing watching? A. The only thing is what I said there. I said me and Tommy would do the work, George, you do the watching. * * *

"Q. Didn't you say on direct examination that nobody was designated to do the watching? A. The only thing is that George he was not feeling very good and I said Tommy and I would do the work and he was to watch.

"Q. But isn't it a fact that there was no one among the three that was designated to

do any watching at that time before this accident? A. No sir. * * *

"Q. Put it this way: Isn't it a fact that the switchman at the switch office should not have allowed cars to come off the hump down past the point where you were working, knowing that you were working there? A. No sir."

The foregoing testimony speaks for itself. I can find no evidence that Myers had any interest to serve that was adverse to the plaintiff, by reason of the fact that he was on furlough; nor does it appear that he contradicted himself as to what Willis was doing. Maintenance of way men probably do not react promptly to questions involving the words "appointed", "designated" and the like. Theirs is a practical job, and they do not formally meet and decide such matters as who is to act as a lookout. The only physical efforts that the testimony discloses were made by Donofrio, who was swinging a sledge, and Myers, who was holding the punch. There was nothing left for Willis to do except to observe. It does not appear that he directed Myers how to hold the punch, or Donofrio how to swing the sledge. They were experienced men and knew their duties, and the only conclusion that I can draw from the testimony is that, by some process satisfactory to the three men, it was understood that Willis should look out for his companions in the matter of approaching freight cars, and that he failed to do so.

The plaintiff's attempts to demonstrate that, on prior occasions when such work was being done as the task on which Donofrio and Myers were engaged, Switch B was closed, putting four tracks out of operation, were not successful, as the testimony is presently understood. This was a busy freight yard and, in order to demonstrate that there was a departure from prior practise so as to make out negligence on the part of the defendant in not closing all the tracks which were controlled by Switch B, something more was required of the plaintiff than is shown in the testimony of Myers, because the common sense of the situation is in harmony with what he stated. Also he is confirmed in that by the deposition of the man who rode the offending car.

### Van Camp.

This witness rode that car, and had been in the defendant's employ for thirty-nine years, and was still working for the Railroad when his testimony was taken. This car was marked for track 15, so that he knew his destination when he took his position on the brake deck at the rear end of the car, as it was moving. There was another one about three car lengths ahead of him, which went off at Switch A to track 21.

Obviously, this means that a lookout at Switch 14, looking to the east, would have observed this car, and an experienced person would have known that it would either move off at Switch B, 240 feet east, or continue through Switch B to Switch 14, where it would go on track 15, 16 or 17. As his car approached Switch 14, Van Camp could see the three men there for a while, but they passed out of his sight since he was at the rear end of his car, at a distance of from 120 to 140 feet, because the roof structure of the car, in front of him, screened his view.

He said that a car marked for No. 14 at the hump would be dropped on some other track because that was closed as has been shown, and the Yardmaster would decide which was the most convenient track to receive a car so to be diverted.

As to the Yard custom he was asked:

"Q. Was there any custom in the yard on prior occasions with reference to the manner of switching cars when men were working at a switch? A. Yes sir.

"Q. Will you please state that custom? A. Well, it was just the same as this was, exactly. The men would go down there and they would work and we would work too.

"Q. Was it customary to set the switch immediately leading into the track on which they were working so that no cars would go into that track but they would go past the point where they were working? A. Well, they would fix the switch so that no cars would go in on that track, but they would use the other tracks. * * *

"Q. And was it customary at other times in switching cars in the yard where men were doing that kind of work they were doing at that switch, to set a switch like B immediately ahead of it and block off the ladder track so that no cars would go past the point where the men were working? A. They would only block the switch they wanted to work on.

"Q. What would the men do as the cars came down there? What would the men who were working do when a car came down that track past the point where they were working? A. Why, they would look

out or get off the tracks. That is the only thing I would know."

The witness gave no warning to these men, by word of mouth or otherwise, that his car was approaching them. He said that, when he saw the men prior to the three or three and a half car length interval, they seemed to be looking at the job that they were going to do.

"Q. And you did not yell? A. I was too far away to yell to them."

Using the hand brake, he could stop the car in about 300 feet.

The quotations from the testimony have been incorporated so that it may appear clearly that these fellow workmen of Willis' were apparently frank and ingenuous witnesses, and nothing is to be discerned in either the form or substance of their testimony to justify an insinuation that they were deposing falsely, or that their answers to plaintiff's questions, on direct, were tinged with any hostility to her cause.

As to Donofrio, it is to be remembered that he was seriously injured by reason of the failure of Willis to warn Myers and himself of the approaching car, but a careful scrutiny of his deposition fails to reveal any appearance of bias against the plaintiff on that account.

■ The evidence as a whole is to the effect that, under the circumstances shown, it was in accord with custom to send successive cars into tracks 15, 16 and 17 but not 14; and that the repair gang was so constituted that one of its members should act as lookout to protect his fellow workers against the approach of such cars.

That Willis had acted as lookout on this morning, even before Donofrio went up to the switch office to arrange for the closing to traffic of track 14.

That nothing was suggested by Willis or his companions to the men in the office to the effect that Switch B should be closed, shutting off four tracks, in order that the job in hand should be done. Therefore they all knew that tracks 15, 16 and 17 were to be left open, and cars destined for either would have to pass Switch 14.

There was nothing inherently dangerous or unsafe in that operation, according to the understanding of the men, provided it was conducted according to custom, i. e., by having one man in the gang perform lookout duty.

The custom cannot be assailed on this record, because it was not practiced, i. e.,

Willis did not function as lookout. Under the testimony, he had no work whatever to do, for four minutes before the accident, after he turned off the air at the switch; Donofrio swung the sledge, and Myers held the punch, and if Willis had anything to do but act as lookout during that period, it has not been shown. But it does appear that these other men told him that they would rely upon him to watch, and that he failed them, and himself.

That sixteen seconds (the time required for this car to travel between Switch B and Switch 14) was ample for Willis to give the required warning, is too clear for argument. Active men can cover far more space in a quarter of a minute than is required to straighten up and step aside say three feet. Thus Myers jumped from a stooping posture over the north rail, while the car was traveling five or ten feet, and escaped unhurt.

The custom would have been violated if any man on watch had failed. Willis could have functioned as well at the place where the job was being done, as could a watchman, say fifty feet away, equipped with a whistle and a megaphone. If the latter had failed to give warning, the men would have been in peril, just as they were through Willis' similar default.

It was not the custom which failed, since it was not observed; but the man who was trusted by his companions to practise the custom and did not do so—at the cost of life to himself, and of permanent disability to Donofrio.

The plaintiff's main reliance is upon the case of Doing v. New York, Ontario & Western R. Co., 151 N.Y. 579, 45 N.E. 1028.

The facts are wholly dissimilar. There the injured men were working in a roundhouse, behind a closed door, through which a freight car passed which had a defective brake. Those men had no knowledge of the movement of that or any other car. Nor was there reason on their part to expect its entrance into their shop.

The custom which permitted such an occurrence was inherently and unreasonably dangerous, and the offending company owed it to its employees to protect them from it.

Here it appears, not that a dangerous custom was permitted to prevail, but that a custom which could have been observed so as to protect these men, was not permitted

to function by one of those whose own safety depended upon its observance.

The verdict cannot stand, because it is contrary to the only evidence in the case; that evidence requires that a verdict be directed for the defendant, and it is so ordered.