## UNITED STATES v. HALLIDAY.
### No. 4714.

Circuit Court of Appeals, Fourth Circuit.
Jan. 9, 1941.

Fendall Marbury, of Washington, D. C., Attorney, Department of Justice, and Oscar H. Doyle, U. S. Atty., of Anderson, S. C. (Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., and Wilbur C. Pickett, Sp. Asst. to Atty. Gen., on the brief), for appellant.

Warren E. Miller, of Washington, D. C., and R. K. Wise, of Columbia, S. C., for appellee.

Before SOPER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

DOBIE, Circuit Judge.

This was an action on a war risk insurance policy, brought by James H. Halliday (hereinafter called the insured), who sued through his Committee, Annie Halliday, to recover total permanent disability

benefits under his term policy, which was issued between June 23, 1918, and April 2, 1919, while he was in the military service of the United States.

In his complaint, filed November 20, 1936, insured alleged that he had been totally and permanently disabled since April 2, 1919, the date of his discharge from the army. Insured's policy, which had lapsed for nonpayment of premiums, was reinstated on August 1, 1920, and premiums were paid which carried the policy, including the grace period, to October 31, 1920. Accordingly, the issue submitted to the jury was whether insured was totally and permanently disabled before October 31, 1920.

At the close of the case, the Government moved the court to direct a verdict in its favor upon the ground that there was no substantial evidence that the plaintiff was permanently and substantially disabled at any time while the insurance was in force. This motion was overruled by the court. Thereafter, the jury rendered a verdict for the insured and fixed April 2, 1919, the date of the insured's discharge from the army, as the date of his total and permanent disability. Judgment was accordingly entered in favor of the insured. The Government strenuously objected to some of the instructions given by the trial judge and to certain of his rulings on the admissibility of evidence. Since we believe that the lower court should have directed a verdict in favor of the Government on the ground that there was not substantial evidence of total and permanent disability to go to the jury, it is not essential that we pass on the other questions involved in this case.

■ After a careful survey of the record, we are forced to the conclusion that there was no substantial evidence to prove that the insured was totally and permanently disabled on or before October 31, 1920. We therefore proceed to a brief survey of this evidence.

Insured introduced only one medical witness, Dr. J. N. Land. Dr. Land did testify: "I would not have advised him to do any work since he has been out of the Army. I think it would have been harmful to him. If he had just been put to work I think he would have a complete collapse, mentally and physically. He is not physically in good shape, and is mentally in bad shape. When he got out of the Army I didn't hold any hope for his recovery, a man in his condition will go from bad to worse. I think he has gradually progressed since he came out of the Army. I was instrumental in having a committee appointed for him."

This testimony, however, has little probative force. Dr. Land testified that he had not examined the insured "physically until about six years ago",—more than thirteen years after the expiration of the policy. He further stated that he had seen the insured only a very few times before that date: "I would say I saw the man at least two or three times a year, possibly more." As Dr. Land testified, he would see the insured on the streets or in a drug store. On these occasions when the insured sought help and advice of the doctor, the doctor stated: "He was not my patient. I simply shunted him off and got away from him as best I could." In other words, Dr. Land did not see the insured professionally on the few occasions when Dr. Land came into contact with the insured, prior to the doctor's employment by the insured six years before the trial. Dr. Land testified further that insured was neurasthenic and a hypochondriac; but he admitted that he was a general practitioner and in no sense an expert or specialist in mental diseases.

Insured's wife testified that she had married him in April, 1921. She testified further that prior to their marriage, insured had come to see her from his home, about eighteen miles away, or from the hospital where he was taking treatment. Insured, according to his wife's testimony, was at the time of their marriage far from well and complained constantly of his stomach, heart and kidneys. She said, too, that farm work upset his nerves and stomach. She did marry him, however, and bore him four children. Two of insured's brothers also testified on his behalf. The testimony of the brothers was far from convincing on the question of insured's total and permanent disability. One brother testified that the insured was never "able to make a full week". The other brother testified that he had "not seen him (insured) do any successful work since he was discharged".

There were several other lay witnesses testifying for insured but the testimony of these witnesses was utterly lacking in definiteness. Thus, Mr. Leverett testified: "When he (insured) returned, he seemed to be a man that didn't have a grip on

himself. It was nervousness of some kind." Mr. Jackson stated: "I would say that for the last ten or twelve years he has seemed to be very nervous. * * * I have had no opportunity to see him at his farm nor to know whether he did any work." Other lay witnesses testified along the same general line.

There were numerous examinations of insured by government physicians from April 12, 1920, to April 11, 1935. These reports showed that insured's tuberculosis had been arrested and no note was made in these reports of any positive mental or nervous disorder on the part of insured until February 14, 1921. In one of these reports, dated December 17, 1924, we find: "Mental Examination: Patient answers questions readily and accurately. Orientation and memory good. Insight and judgment good. There is no history or evidence of any psychosis. Findings of Board: It is our opinion that claimant has an industrial disability of fifteen (15) percent from tuberculosis, chronic pulmonary, minimal involvement, apparently arrested. There is no N. P. (neuro psychopathic) disability".

In 1925, insured applied for an ordinary life insurance policy, with a provision for total permanent disability benefits, in the Pacific Mutual Life Insurance Company. Insured represented to that Company's doctor, who examined him, that he was then in good health. On the basis of this examination, the doctor recommended that the policy applied for be issued to the insured. The Company issued a substandard policy to Halliday, though he never accepted and paid for this policy. This doctor stated that he did not "discover upon examination or inquiry any evidence of disease or functional derangement, past or present, of the brain or nervous system". He also testified that if there had been anything noticeable in the conduct of insured, he would have noted it in his report.

Insured's wife testified further that insured's condition did not improve after he was married and that he had threatened to commit suicide and kill her and the children; and that she had left him several times and stayed with her mother until he "would get a little better". But, as she testified, she had "never requested that he be sent to any mental hospital because he did not want to be", although she "thought it would be a good thing". She stated that she had been appointed Committee for the insured on December 19, 1935, when he was formally adjudged non compos mentis, and that he had been sent to a mental hospital in 1936 and had stayed in this hospital only about thirty days. There was testimony by several witnesses that the plaintiff had pursued a course of vocational training in agriculture after his discharge from the army and that he had to some extent engaged in farming. After insured had ended his vocational training, he rented a 50-acre farm upon which he did some work and later he bought a farm of 73 acres, on which he was living with his family at the time this case was tried.

Even if insured had been disabled at any time before the expiration of his war risk policy on October 31, 1920, due to mental or nervous disease, there is no substantial evidence to show that his nervous or mental disorder brought about disability that was either total or permanent. It was aptly stated by Circuit Judge Gardner in United States v. Kiles, 8 Cir., 70 F.2d 880, 883: "Passing for the moment the question of the probative force of the testimony of the lay witnesses, and assuming that it was sufficient to show that the insured was suffering from mental derangement or insanity, still it does not appear what kind or degree of insanity afflicted the insured. That term is a very uncertain, ambiguous, and flexible one, and both legal and medical authorities recognize that there are different kinds and degrees of insanity (Rodney v. Burton, 4 Boyce [27 Del.] 171, 86 A. 826; Clarke v. Irwin, 63 Neb. 539, 88 N.W. 783; Hopps v. People, 31 Ill. 385, 83 Am.Dec. 231); that the disease is as varied in intensity and shades of difference as is human character (Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U.S. 612, 4 S.Ct. 533, 28 L.Ed. 536; Denson v. Beazley, 34 Tex. 191). It may be total, complete, general, or partial in character, and it may be either permanent or temporary in duration. State v. Jack, 4 Pennewill (Del.) 470, 58 A. 833. So, while insured's mental affliction totally disabled him, it may nevertheless have been curable and temporary in duration, and it must be remembered that the insured did not die from this affliction. In the absence of proof as to its character, we cannot presume that the affliction was permanent."

In this connection, we might also note insured's failure to secure adequate hospitalization when this would have been

available to him in a government hospital. It thus becomes highly speculative whether insured's ailments, whatever these may have been, would not have been cured by the medical treatment which was in his potential grasp. See the cases (all decided by this Court) of Mikell v. United States, 4 Cir., 64 F.2d 301; United States v. Ennis, 4 Cir., 73 F.2d 310; United States v. Marsh, 4 Cir., 107 F.2d 173; Neely v. United States, 4 Cir., 115 F.2d 448, decided November 12, 1940.

■ Although it no longer becomes necessary for the purposes of this opinion to consider the correctness of the District Judge's rulings on the evidence, we do feel that one of these rulings was of such importance as to merit our present consideration. The District Judge announced early in the trial that no evidence would be admissible as to the insured's condition subsequent to December 9, 1935, the date on which the county Probate Court had adjudged the insured as of unsound mind and had appointed his wife as committee for him; that the admission of such evidence would constitute a collateral attack on a judgment which, the District Judge ruled, could not properly be subjected to such an attack. We believe that in this ruling the trial judge fell into error.

■ The adjudication of a probate court that the insured was insane was, as against persons not parties or privies to the lunacy proceedings, only prima facie evidence of the insured's actual insanity on the date of adjudication. See Viccioni v. United States, D.C.R.I.1936, 15 F.Supp. 547, 549-550; cf. Cathcart v. Matthews, 1916, 105 S.C. 329, 343, 89 S.E. 1021, 1026. See, also, Hall v. Ætna Life Ins. Co., 8 Cir., 1936, 85 F.2d 447, 451; Chaloner v. New York Evening Post Co., D.C.S.D. N.Y.1919, 260 F. 335, 337; Johnson v. Pilot Life Ins. Co., 1940, 217 N.C. 139, 143, 7 S.E.2d 475, 477, 128 A.L.R. 1375. Furthermore, this finding of the probate court, even if it be treated as conclusive evidence as against the Government, should not be absolutely controlling in the instant case. The problem here is different from the one involved in the probate court; for the state of mind sufficient to secure an adjudication of "insanity" in an informal and ex parte proceeding in a probate court, is not necessarily, and often is not actually, sufficient to constitute disability that is both total and permanent. The instant case hinges upon the proof of a disability of mind far more serious than that required to be proved in a proceeding before the probate court. The probate court's prior adjudication is only of evidential value in determining the total and permanent disability of a claimant under a war-risk policy; the adjudication is not conclusive, but it must be considered along with all the other relevant evidence for a determination in the District Court of whether or not the claimant is actually suffering from a total and permanent disability. See Viccioni v. United States, supra, 15 F.Supp. at pages 549, 550.

■ As we have indicated, the Government's motion for a directed verdict at the close of the evidence was denied in the District Court without any express reservation of decision. The Government did not later move to have the ultimate verdict and judgment set aside and for the entry by the District Court of judgment in favor of the Government notwithstanding the verdict. The Government did file a motion for a new trial, which was overruled. Yet we still believe we have power to direct that such judgment in favor of the Government be entered in the District Court. Under the Federal Rules of Civil Procedure 50(b), 28 U.S.C.A. following section 723c, "Whenever a motion for a directed verdict made at the close of all the evidence is denied * * *, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." The denial of the original motion for a directed verdict, it seems, is now treated as the equivalent of a reservation by the District Court. Accordingly, we believe that the Government's failure to move in the court below for judgment in its favor notwithstanding the verdict does not restrict our power in the premises. See Conway v. O'Brien, 2 Cir., 1940, 111 F. 2d 611, 613. Also, cf. Eastern Livestock Cooperative Marketing Ass'n, Inc., v. Dickenson, 4 Cir., 1939, 107 F.2d 116, 120; Lowden v. Denton, 8 Cir., 1940, 110 F.2d 274, 278. And see the remarks of Hon. William D. Mitchell, Chairman of the United States Supreme Court's Advisory Committee on the Federal Rules of Civil Procedure, Federal Rules of Civil Procedure and Proceedings of the American Bar Association Institute, Cleveland, 1938, at page 315: "We do not by this rule make it necessary for the trial court even to say, 'I am reserving the question of law.' That is a form anyway, and we

make it safe in all cases by the device of prescribing that wherever he refuses to grant a motion for directed verdict he is deemed to reserve the question of law, taking the verdict subject to his later determination, and consequently may on motion afterwards set aside the verdict, grant judgment notwithstanding, and the Circuit Court of Appeals may take the same action."

Compare, too, Brunet v. S. S. Kresge Co., 7 Cir., 115 F.2d 713, decided November 20, 1940; Willis v. Pennsylvania R. Co., D.C.E.D.N.Y., 35 F.Supp. 941, decided December 5, 1940; Montgomery, Ward & Co. v. Duncan, 61 S.Ct. 189, 85 L.Ed. ——, decided Dec. 9, 1940.

Rule 50(b) of the Federal Rules of Civil Procedure does specifically provide: "Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict". The rule also declares: "A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative". Then follow, in the rule, provisions as to the powers of the trial judge under these motions. We think it would have been the course of wisdom in the instant case for the Government·to make in the lower court the motion for judgment notwithstanding the verdict. Yet we find nothing in the rule that restricts our power, as indicated in the case of Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636, to direct the entry of judgment by the lower court in favor of the defendant, rather than to order the granting of a new trial, when the orderly administration of justice seems to require it. And this seems none the. less true even though the verdict of the judge was here in favor of the plaintiff,. and even though here the defendant failed to file (as he is permitted under Rule 50(b)) in the lower court a motion, after the verdict, "to have judgment entered in accordance with his motion for a directed verdict."

The judgment of the District Court is reversed and the case is remanded to that court with directions to enter judgment in favor of the United States, appellant-defendant.

Reversed.