## HOWARD UNIVERSITY v. CASSELL.

### No. 7727.

United States Court of Appeals for the
District of Columbia.

Argued Oct. 7, 1941.

Decided Dec. 1, 1941.

Writ of Certiorari Denied April 27, 1942.

See — U.S. —, 62 S.Ct. 1046, 86 L.Ed. —.

Mr. George E. C. Hayes, of Washington, D. C., for appellant.

Mr. Warren E. Magee, of Washington, D. C., with whom Messrs. Charles S. Baker, Benj. L. Tepper, and Daniel J. Andersen, all of Washington, D. C. were on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

This suit was begun in the court below by appellee, Albert I. Cassell, against appellant, Howard University, to recover $26,250 as compensation for services as agent of the university in supervising and managing for a period of three and a half years its so-called university extension plan. The complaint was filed June 4, 1936, and claimed recovery (1) on a quantum meruit; (2) on an agreement to pay an express sum; and (3) on the acceptance of the services and the recognition of their value by the university in the sum sued for. The university by appropriate pleadings denied any express agreement or any ratification or acceptance of any benefits for which it was liable, but alleged that the services rendered by Cassell were embraced in and were part of his duties as a salaried employee of the university. The university also pleaded the statute of limitations to the complaint and to each part thereof. There was a trial to a jury and a verdict in favor of Cassell for $19,687.50. From the judgment of the court on the verdict, this appeal was taken.

From 1920 until sometime after the events out of which this controversy grows, Cassell was associated with Howard University in a number of different capacities. For several years he was head of the Department of Architecture, and thereafter for a number of years University Architect. During a part of the latter time he was also Superintendent of Buildings and Grounds. As architect, he received variously $5,000 and $6,000 per annum, and for most of the time an additional sum of $1,500, apparently for services in supervising the buildings. In the early part of 1929 the university began the development of a 20-year program of expansion and extension work, and in June of 1929 a committee called the Trustee Committee on Extension was set up by the board of the university. The task of the committee was to work out the plan and ob-

tain funds to make it effective. In July of 1929 the Committee made Cassell its agent, and from then until January 1, 1933, a period of three and a half years, he performed services in connection with the purchase of real estate contiguous to the university grounds and the maintenance and rental of the same. On this appeal, he insists that the only issue is whether as such agent he was entitled, either by express agreement or by the acceptance of his services and work, to receive other and additional compensation. The record contains a vast amount of contradictory evidence on the subject, but in the view we take of the case it is unnecessary to consider this, since we think Cassell's services terminated and his compensation, if he was entitled to any, became payable more than three years (the statutory period) before this suit was begun. And we are unable to find in the record any facts on which to sustain his claim that the running of the statute, for any part of this time, was tolled.

As to the commencement of his services in extension work, Cassell testified that early in 1929 the president of the university asked him if he would "undertake the problem" of securing the property necessary under the extension plan and assured him that, if he would, he would be given $7,500 a year in addition to his other compensation. On July 1, 1929, a committee of the board met under the chairmanship of the president. Cassell was present by invitation, and the committee was informed by the president that they were to go ahead with the acquisition of the needed properties under the then available $600,000 grant from the General Education Board and the Rosenwald Foundation. Cassell was informed that he was to act as agent for the committee. Subsequently and about April 23, 1932, Cassell obtained from Hawkins, secretary of the committee, a letter addressed "To Whom it May Concern", stating that "at a regular meeting of the Extension Committee of the Trustee Board of Howard University Mr. Albert I. Cassell was duly appointed as Agent to represent the University in the matter of negotiations for purchasing property * * ".

So much for the beginning of Cassell's extension agency; now for its termination. On December 5, 1932, the Board of Trustees met and adopted the following resolution:

"Voted, That the responsibility for the management of all real estate of the University heretofore purchased from the Extension Fund, so-called, be assigned to the Treasurer of the University on and after January 1st, 1933, in accordance with the requirement of Article III, Section 5, of the By-Laws.

"Voted Further, That the Committee on Property Extension be required to prepare and submit to the Chairman of the Board a report as of December 31st, 1932, of all properties purchased and managed by it up to the present time, and containing full details showing the rents, encumbrances, insurance carried, expenses, and any other information which the Committee may deem proper.

"Voted Further, That the Board hereby express its thanks to the Committee for its arduous and efficient labors in purchasing and managing the property in question for the University."

On the following January 4th the Committee requested Cassell to submit by January 20th a comprehensive report of his work and appropriated the sum of $300 for his bookkeeping and clerical expenses in connection with the preparation of the report. On January 5th the president informed Cassell of the committee's action, and within a week or two thereafter Flexner, chairman of the board, requested Cassell to hurry the report; and again in February instructed him to turn over promptly to the treasurer of the university all of the records of the extension fund. Then on February 28th, Flexner telegraphed Cassell, demanding that the records be turned over to the treasurer at once. The same day Cassell telegraphed Flexner that he needed the records to prepare his report. March 1, 1933, Flexner reiterated his demand, and notified Cassell he would have access to the records in the treasurer's office; and on March 22nd wrote Cassell, quoting the December 5th action of the Board of Trustees (requiring that the extension property be turned over to the treasurer), recounting the request to turn over the records to the treasurer and demanding that Cassell submit his report on extension activities at once. Flexner's letter concluded: "After the completion of this report your further duties in connection with the Trustee Committee on Extension will be confined solely to the performance of the services which that Committee may call upon you to render in connection with the purchase of further pieces of property. These properties will be administered by the

treasurer. You will therefore be free to devote your entire time to the construction projects already assigned to you [as architect] by the Board." On March 26th Cassell telegraphed Flexner, giving further reasons for delay; and on March 29th following again wrote Flexner, stating that the latter's letter was his first knowledge of the resolution of the trustees turning the management of extension properties over to the university treasurer. The next day Flexner replied that Cassell's duties were to remain "what they are" until he was otherwise notified, and again requested the report. Subsequently the treasurer of the university sent Cassell a certified copy of the minutes of the December 5, 1932, meeting of the trustees. On April 21, 1933, Cassell sent Flexner his final report of activities in connection with the extension fund. The period covered was from July 30, 1929, to January 1, 1933, and the concluding paragraph of his letter of enclosure was as follows: "I thank you for the opportunity of presenting this review of my connection with Howard University's land extension program during the past three years. To date I have received no compensation of any description for this prolonged task. It is my hope that you will recommend to the Trustees that I be compensated adequately for these services."

Since more than three years elapsed between January 1, 1933, or April 20, 1933, and June 4, 1936, when the suit was begun, it is obvious that if either of the two first above dates be accepted as the time of the accrual of Cassell's cause of action, the plea of the statute will defeat recovery. D.C.Code 1929, T. 24, § 341. But Cassell's position is that his services did not terminate on either January 1, 1933, or April 21, 1933, but continued until March or April, 1934. One basis for this assertion is that after delivery in April of his report to the authorities of the university, the report was referred to accountants for audit, and the auditors from time to time during June, July, and August of 1933 called on Cassell for explanation and interpretation of several items in the report. This work, he says, required his presence and services for a time and hence necessarily prolonged the period during which he could legally demand compensation. The learned District Judge accepted this view, and in denying the motion for a directed verdict at the close of plaintiff's case, said that since the evidence showed that Cassell did work in June, July, and August in assisting the audi-

tors in the examination and verification of his accounts, the obligation of the university to pay him did not accrue until after he had performed this duty.

But the evidence from Cassell's own pen shows that the services which he had been required to perform and for which he was asking compensation terminated in April, 1933. In a letter to Flexner (May, 1934), he shows this unequivocally, for there he says that April 21, 1933, was the date "on which I completed my connection with the Extension Project by transmitting to Doctor Flexner a report covering in detail my activities in connection with this fund." The record shows absolutely no agreement by or obligation upon Cassell to assist auditors of the university in checking his report. And the fact that he was later requested by the auditors to verify several items cannot under any theory that we know of be considered as prolonging the statutory period of limitations. The "services" to the auditors outlined in Cassell's testimony consisted in explaining two matters contained in his report which the auditors regarded as questionable. One of these transactions was the purchase of a trust from a member of the Extension Committee and the other matter had to do with a seeming manipulation of purchases from parties designated in the report as Sanders and Saunders. Cassell explained the transactions, thus clearing the names of the university officials involved, including himself. His explanation was a service to himself more than to any other party. If Cassell had a claim against the university, that claim accrued when he filed his final report and in the accompanying letter requested payment; and he could have brought his suit then or at any time thereafter within the three-year period. His rights did not await a check by the university auditors; that was the concern of the university alone. The statute begins to run on the conclusion of the service, where it is not required by agreement or statute that an audit must be made before payment shall be due. United States v. Utz, 3 Cir., 80 F. 848; Withers v. United States, 69 Ct.Cl. 584; Carlisle v. United States, 29 Ct.Cl. 414. In Hornblower v. George Washington University, 31 App.D.C. 64, 14 Ann.Cas. 696, we held that an architect's right of action did not even await the presentation of his bill. And the situation here is entirely different from those cases which arise under statutes requiring submission of the claim to audit and settlement by a proper depart-

ment of government as a condition precedent to the liability of the defendant.

However, to buttress his argument that his cause of action accrued less than three years before suit, Cassell sets forth other activities subsequent to June 4, 1933, which bear on the extension program. Specifically, he lists (1) going to New York City in March or April of 1934 at the request of Dr. Tobias to explain to the Finance Committee the negotiations which had previously been had with Dr. Kelly Miller, a retired professor of the university, looking to the purchase of the latter's property; (2) "dealings with banks" after June 4, 1933; (3) presenting to the Commission of Fine Arts and the Department of Interior in November, 1933, a blueprint of the plan for Howard University and getting their approval; and (4) negotiations with the university concerning Cassell's liability for the loss occasioned when a check (for rents collected) given him by a sub-agent was not paid because of failure of the drawee bank.

■ But the answer is that Cassell never sought any compensation for these things and does not now. He paid his own expenses to New York and never asked for reimbursement. As to that matter, he was merely giving a report on negotiations carried on by him while he was the Extension Committee's agent, and the trip appears to have been primarily to justify his friend Dr. Miller's insistence that the university was morally bound to conclude the purchase of his property. Concerning the alleged "dealings with banks", the record shows only that Cassell had conferences with the university auditors (which we have already disposed of) at the Munsey Trust Co., and that the president and one employee of the company did not then know of the revocation of his authority as extension agent. Next, the blueprint which Cassell presented to the Commission of Fine Arts had been prepared and transmitted to the university by him in 1932, and the record does not show that he was obligated or asked to submit it to the Commission. As to the non-payment of the check from the sub-agent, that was caused by Cassell's admitted negligence in holding it for more than a month before depositing it in the university's account. The university insisted on Cassell's bearing the loss, and it was this dispute which carried over past June 4, 1933.

It is obvious that these activities of Cassell after the latter date do not affect the running of the statute. To hold otherwise would be to make the statute of no effect, for an employee could extend the statute indefinitely by performing gratuitous, voluntary, or self-serving acts from time to time. Here Cassell's extension agency was clearly concluded on April 21, 1933, at the latest, and, as we have seen, he recognized this fact by his letters and his actions. And his statement of claims against the university (set forth in his letter of October 21, 1935, to Dr. Tobias) was for three and a half years' extension services. In that letter he stated: "I was appointed as Agent for Howard University Trustee Committee on Extension in the month of July 1929 * * * and served in this capacity from July 1, 1929 through January 1, 1933, a period of 3½ years * * *. My final report on Extension covering my 3½ years' work was delivered to Dr. Abraham Flexner by registered mail on April 21, 1933 * * *". In this letter to Dr. Tobias, Cassell asserted a claim of $26,250 for his three and a half years' extension services. It is this same exact sum that he seeks in the present suit. Furthermore, the Extension Committee whose agent Cassell was, lost any breath of life it then had when it made its final report on April 21, 1933. On April 11, 1933, the trustees had voted that the Extension Committee be discontinued as of the date of its final report.

■ The conclusion is irresistible that Cassell's services as extension agent ended April 21, 1933, and his cause of action accrued on that date. Compare Wren v. Wehn, W.Va.1941, 12 S.E.2d 809. And it may be noted that even if the trip to New York on the Kelly Miller matter or the presentation of the blueprint to the federal authorities had been an authorized service to the university and entitled to compensation, it was under new appointment and the running of the statute on the services here sued on would not be affected, there being a lack of continuity between the two employments. Salvador v. Feeley, 105 Iowa 478, 75 N.W. 476; Ertel v. Warren, 157 Mo.App. 592, 138 S.W. 694.

Appellee, however, argues that even if the views hereinbefore expressed are correct, the university is estopped to assert the statute because of conduct which led him to believe he would be paid and lulled him into delaying suit until the statute had run. This requires a further reference to the testimony in the record.

As we have pointed out, Cassell filed his report with Dr. Flexner on April 20 or 21,

1933, and expressed the hope that Dr. Flexner would "recommend to the Trustees that I be compensated adequately for these services". A day or two later Dr. Flexner acknowledged the letter and said he was referring it to the Chairman of the Committee on Buildings and Grounds "for such action as he thinks proper in the circumstances". About the middle of May, Cassell went to see Flexner in relation to his expenses in making up the report, the cost of which he said was in excess of the $300 appropriated to him by the university for that purpose; and when he had explained the matter to Dr. Flexner, the latter said not to worry, that it would be investigated and settled to his satisfaction. In the latter part of 1933, Cassell went to see Crawford, Chairman of the Buildings and Grounds Committee, to ascertain "what his reaction was to my request * * * He told me not to become impatient, not to lose my temper, but to just stay calm and I would be paid". Again in 1933, Cassell brought his claim before a combined meeting of the Buildings, Finance, and Executive Committees of the university, and a new committee was appointed "to look into the merits of the case". In May, 1934, Flexner wrote Cassell, asking for a written statement and stating that he was preparing to have a searching examination made into the merits of every one of the points. A few days later Cassell answered Flexner's letter and outlined his differences with the university trustees, including his claims for compensation and for reimbursement for clerical expenses. Flexner acknowledged the letter and stated: "The matters will be investigated and I hope settled to the satisfaction of everyone concerned in the very near future". Again in September Flexner wrote that he thought the claim should be submitted in detail to an arbitration committee with power to pass finally upon it. Cassell replied that he would act promptly in presenting his claim "to be submitted to an arbitration committee selected in the usual manner". In October, 1934, the secretary of the university wrote to Cassell that a committee had been appointed with power to consider his claims against the university; and a month later Flexner wrote asking for a detailed statement of claims; and again wrote that Messrs. Hungate, Hedgeman, and Harris had been authorized by the board to do whatever was right under the circumstances. In December Cassell wrote Flexner that he had talked to Hungate, who had asked him to resubmit his vouchers;

and Flexner wrote back that he had written Hungate urging the committee to adjust the claims as soon as possible.

In early 1935 Cassell wrote Tobias, complaining that his claims had been discussed at committee meetings without notice to him, but stating that he had been asked by President Johnson to present his claim to the committee on January 14, 1935. A few days later President Johnson wrote asking Cassell to appear before the committee on January 16th. On January 15th Cassell wrote Tobias that because of pressure of work and unfair withholding of payments he could not attend the meeting. Subsequently Hungate wrote Cassell telling him to present to the committee his claims within thirty days. Later Hungate wrote him upbraiding him for not filing his claim within the time requested and urging that he do so at once; and in May, 1935, the secretary of the university wrote Cassell that he had been instructed by the Executive Committee of the trustees to call his attention to the fact that his claims must be filed and unless filed within thirty days his failure "will be considered just cause for summary action". On the same day the chairman of the committee wrote Cassell that if his claims were presented the committee would consider them with care. Apparently nothing else happened until August, 1935, when counsel for the university wrote Cassell asking him to get his claims in. A month later Cassell replied, giving reasons for delay. In October, 1935, Cassell wrote to Tobias giving a detailed statement of claim, and the next day Cassell personally appeared and submitted his claims to the committee, and the committee in turn reported to the trustees, recommending that the dispute be settled by arbitration. The president of the university thereupon asked Cassell if he would arbitrate, and Cassell in turn replied that he would if carried out in a certain manner, which he outlined. In November the Executive Committee requested the Building Committee to summarize Cassell's position so that the Executive Committee could have the matter arbitrated, and Cassell was informed of this. Cassell and the president of the university talked about arbitration, but no definite agreement was reached. Cassell testified, "we were just talking about the thing all the time". In February of 1936 the president of the university telephoned Cassell and asked him for further justification of his "tangible and intangible claims", and Cassell replied that he was annoyed at the delay and that he

didn't think it necessary to provide further details. He consulted Dr. Tobias, who told him he had been unfairly treated and advised him to sue. He also consulted Mr. Crawford, at the time vice-president of the Board of Trustees, who advised him first to exhaust every means of settling and finally reached the conclusion, and so advised him, that he ought to go ahead and sue. On June 4, 1936, this suit was brought.

A careful reading of all of the testimony, which we have summarized, shows very clearly that the university never acknowledged the correctness of the claim or that it owed anything or that it would pay anything. The most that can be said from it all is that there were negotiations looking toward an amicable settlement. Obviously there was strong opposition in the Board of Trustees to the payment of the claim, and the only assurances, if there were any, were to the effect that Cassell would be fairly dealt with. This is not enough to bring into operation the doctrine of equitable estoppel. Kenyon v. United Electric Rys., 51 R.I. 90, 151 A. 5; Klass v. City of Detroit, 129 Mich. 35, 88 N.W. 204, 95 Am.St.Rep. 407; Howe v. Sioux County, 180 Iowa 580, 163 N.W. 411; City of Athens v. Evans, Tex.Com.App., 63 S.W.2d 379. See also Andreae v. Redfield, 98 U.S. 225, 25 L.Ed. 158. And the question of arbitration is disposed of by what we said in Hornblower v. George Washington University, 31 App.D.C. 64, 75, 14 Ann.Cas. 696. In that case there was a controversy and a definite agreement to arbitrate. Of this we said: "If, by this agreement to arbitrate, it appears from the record that plaintiffs, by the action of the defendant, were induced not to bring their suit, then we think defendant would be estopped from pleading the bar of the statute of limitations. If, however, after the agreement was made to submit to arbitration, plaintiffs took no steps toward having the matter submitted, and did not insist upon the defendant's submission of the matter, such an agreement, we think, cannot be held to stop the running of the statute. * * * It is not sufficient, if it should appear, that defendant failed, or even refused, to appear before the arbitrator and submit its case. Defendant must have done something that amounted to an affirmative inducement to plaintiffs to delay bringing action."

As we have already said, this record does not show that the university actually induced Cassell not to bring his suit. On the contrary, practically from the time of the submission of his claim to the time when he brought suit, the attitude of the board was one of question, if not indeed of active opposition to payment. And after it became evident that the claim would probably not be recognized, Cassell had ample time and opportunity to bring his suit before the bar of the statute fell. Instead, he even delayed in presenting his claims to the university authorities, resulting in acrimonious correspondence between the university and himself. It is, therefore, quite out of the question to say that anything the university did lulled Cassell into inaction until after the limitation period. See Glennan v. Lincoln Investment Corporation, 71 App.D.C. 365, 110 F.2d 130, and Thompson v. Park Savings Bank, 68 App.D.C. 272, 277, 96 F.2d 544, 549.

Finally, Cassell claims that appellant may not urge the statute of limitations on this appeal because of its failure to comply with Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. That rule provides: "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict * * *. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. * * * *"

Here the defendant moved for a directed verdict on the ground of the statute of limitations at the close of the plaintiff's evidence and again at the close of all the evidence. The court denied the motions. After verdict, defendant moved for a new trial but did not move within 10 days or at all to have the verdict set aside and judgment entered in accordance with its motion for a directed verdict. However, the defense was not thereby waived, and the court's ruling may still be appealed from. United States v. Halliday, 4 Cir., 116 F.2d 812, 815; Conway v. O'Brien, 2 Cir., 111 F.2d 611, 613, reversed on other grounds, 312 U.S. 492, 61 S.Ct. 634, 85 L.Ed. 969. See also Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945.

Reversed and remanded with instructions to dismiss the complaint.